**UNITED STATES of America,**
**Plaintiff,**

v.

**ONE (1) 43 FOOT SAILING VESSEL WINDS WILL, LICENSE O. N. 531317/ U. S. AND EQUIPMENT, Defendant.**

No. 75–433–Civ–CA.

United States District Court,
S. D. Florida.

Dec. 8, 1975.

Patricia Kyle, Asst. U. S. Atty., Miami, Fla., for the United States.

Mitchell D. Aronson, Miami, Fla., for defendant.

## FINAL JUDGMENT OF FORFEITURE AND MEMORANDUM OPINION

ATKINS, District Judge.

This cause came before the Court on plaintiff's Motion for Summary Judgment seeking to forfeit the sailing vessel "Winds Will." The Court having consid-

ered the record and being fully advised in the premises, finds and concludes that final summary judgment of forfeiture be entered in favor of the United States.

## THE FACTS

On September 8, 1974, at about 10:00 P.M., the defendant vessel "Winds Will" was observed by the United States Coast Guard Cutter "Dauntless" in or near the Yucatan Channel proceeding without lights. The "Winds Will" was approached and boarded by the Coast Guard to check for safety and fishery violations under authority of Title 14, United States Code, § 2 and § 89.

Upon boarding the vessel, Coast Guard Officer LCDR DeLeonardis was informed by Richard W. Davison (a/k/a Davidson) that he was operating "Winds Will," acting as its master, the "Winds Will" was a vessel of the United States and en route to Clearwater, Florida.

In the course of the inspection for safety violation, LCDR DeLeonardis discovered a large green plastic bag in plain view in the vessel's galley which contained a grassy substance. This was later determined to be marijuana. Once on board there was "an overpowering smell of marijuana—it almost knocked you over." A total of 2030 pounds of marijuana was found on the vessel.

## THE LAW

In the case before the Court, the claimant owner urged that the Government was guilty of laches in instituting this procedure. Such an allegation is not supportable in this case.

█ In some cases inordinate delay in the bringing of forfeiture proceedings has been regarded as a denial of due process and an unlawful taking, particularly where the defendant thing is capable of wasting. *States Marine Lines, Inc. v. Shultz,* 498 F.2d 1146 (4th Cir. 1974); *United States v. One 1971 Opel G.T.,* 360 F.Supp. 638 (C.D.Cal., 1973).

██ However, it is clear that forfeiture occurs at the moment of illegal use and is not waived by failure to seize

promptly. *O'Reilly v. United States,* 486 F.2d 208 (8th Cir. 1973), cert. den. 414 U.S. 1043, 94 S.Ct. 546, 38 L.Ed.2d 334 (1973). In the instant case the seizure was promptly made and Claimant cannot object to delays or avail himself of the defense of laches when he himself was the primary creator of those delays. An administrative remedy exists under 19 U.S.C. § 1618 whereby Claimant could have petitioned the Secretary of the Treasury for release of the defendant vessel. Claimant did not avail himself of administrative avenues of relief. Claimant filed his Claim a month after the seizure. The succeeding two months were spent by Customs officers attempting to clarify Claimant's correspondence. Claimant then moved for an extension of response time, then for two continuances and did not file his answer until nearly eleven months after the date of seizure.

██ Claimant cited cases of *Sarkisian v. United States,* 472 F.2d 468 (10th Cir. 1973), and *United States v. A Quantity of Gold Jewelry,* 379 F.Supp. 283 (C.D.Cal.1974). However, both the *Sarkisian* case, *supra,* and the *Gold Jewelry* case, *supra,* were cases brought under Tariff Act violations and pursuant to 19 U.S. § 1602 *et seq.,* and Congressional intent with regard to looking at these statutes as a scheme is different from the intent to be applied in forfeiture actions of the kind presently before this Court. It is clear from the cases in this area that a considerable degree of bad faith is necessary before a party is estopped from pursuing his relief, and the question of bad faith by a party is one within the discretion of the Court. The United States amply demonstrated to the Court by the record in this case that it had not acted in bad faith.

Claimant also alleged that probable cause did not exist to conduct a warrantless search of the vessel.

█ Since the defendant "Winds Will" was a vessel of the United States it is an extension of the territory of the United States and therefore the plaintiff had jurisdiction over it. *United States v.*

*Rodgers,* 150 U.S. 249, 264, 14 S.Ct. 109, 37 L.Ed. 1071 (1893). In exercise of this power, the Government officers had a right to board and inspect the vessel. If contraband is discovered in the process they had the right to search completely and seize the contraband cargo. 18 U. S.C. § 7 (Supp.1974), *Maul v. United States,* 274 U.S. 501, 511, 47 S.Ct. 735, 71 L.Ed. 1171 (1927), *United States v. Wischerth,* 68 F.2d 161 (2d Cir. 1933). In *United States v. Wischerth, supra,* the Court said that probable cause was not required even in the case of a vessel within the protection of New York harbor. If probable cause is not required in such proximity to land with its greater requirements of procedure, it can hardly be said to be required on the high seas where the United States has a more pervasive duty to control its own vessels. The boarding and inspection of the defendant vessel is sustainable, therefore, on the basis of a safety check alone.

■■ The United States has a duty under international law to "effectively exercise its jurisdiction and control in administrative, technical and social matters over ships flying its flag." Article 5, Convention on the High Seas, 15 United States Treaties 2313 (hereafter C.H.S.). On the high seas, only the vessels of the United States Government may exercise jurisdiction over United States flag vessels. Article 6, C.H.S. Since no nation may exercise sovereignty over the waters of the high seas, Art. 1, C.H.S., the maintenance of public order on the world's oceans depends upon effective control in accordance with their treaty obligations by the nations of the world over vessels flying their flag. Throughout history, governments have had a direct and special interest in the conduct and operation of their citizen's vessels and the immunity of such vessels on the high seas from interference by foreign governments. One method of ensuring that foreign governments do not interfere with the exercise of traditional freedoms of the seas by United States vessels requires the United States to exercise effective control over

them as required by international law. Article 5, C.H.S.

■ In order that the United States may effectively exercise its domestic authority in the Special Maritime jurisdiction of the United States and carry out its obligations under international law, Title 14, United States Code, § 89(a) authorizes the Coast Guard:

. . . [to] make inquiries, examinations, inspections, searches, seizures, and arrests *upon the high seas* . . . for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may *at any time* go on board, . . . examine the ship's documents and papers and examine, inspect, and search the vessel . . . When . . it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been commited, by any person, such person shall be arrested . . . 14 U.S.C. ˴89(a) (emphasis added).

When acting under this statute, Coast Guard boarding officers may enforce any law of the United States as an agent of the department or independent establishment charged with the enforcement of that law. Such powers are in addition to and not a limitation on their powers to enforce laws as Coast Guard Officers. 14 U.S.C.A. § 89(b)(c) (Supp.1974). Therefore, express statutory authority exists for the action of the Coast Guard in stopping and inspecting the defendant vessel.

■ This express authorization to stop and board United States vessels beyond the territorial limits of the United States has been administered by the Coast Guard since its inception as one of the duties conferred by its establishing legislation in 1790. Act of August 4, 1790, c. 35, 1 Stat. 145. This extra-territorial authority has been repeatedly upheld. See, e. g., *Maul v. United States, supra.* In finding this authority as being necessarily implied by the need to enforce navigation laws even in the absence

(in that case) of a clear statutory grant, the concurring opinion of Mr. Justice Brandeis in *Maul* stated:

> Whenever on the high seas they were charged with enforcing compliance with our law, there they were, in my opinion, authorized to seize American vessels, regardless of the distance from our coast . . . There is no limitation upon the right of the sovereign to seize *without a warrant*, vessels registered under its laws, similar to that imposed by the common law and the Constitution upon the arrest of persons and upon the seizure of "papers and effects." *Maul*, 274 U.S. at 524, 47 S.Ct. at 743 (emphasis added).

██ The inspection conducted by the Coast Guard was limited to the vessel's safety equipment and other administrative details. No carte blanc to search into private books, papers or personal belongings was anticipated or sought. The direct and special interest of the United States in the safety and administrative control of vessels operating under the protection of its flag and authority of its documents may be analogized to the tradditionally high government interest in liquor or firearms dealers which have historically justified administrative measures such as limited warrantless inspections or searches. The discovery of the marijuana aboard the defendant vessel, although not the direct result of a search, would be sustainable under the limited warrantless administrative search doctrine announced in *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed. 2d 87 (1972).

In this regard, to determine otherwise would be to deny to the United States "the power to define and punish crimes . . . committed on vessels of the United States while on the high seas, and crimes of every grade committed on them while in foreign territorial waters." *United States v. Flores*, 289 U.S. 137, 149–150, 53 S.Ct. 580, 582, 77 L.Ed. 1086 (1933). In citing to the *Rodgers* case, *supra*, the court in *Nixon v. United States*, 352 F.2d 601, 602 (5th Cir. 1965)

found that violations of United States laws which took place on the high seas placed the matter within the special maritime and territorial jurisdiction of the United States. The court went further, though, and said: "Jurisdiction, however, would have attached even had the trawler been in Mexican territorial waters since the offenses occurred on a vessel of United States ownership and registry." Id.

The United States can, and does, proscribe activities of its own nationals engaged in beyond the territorial limits of the United States, *United States v. Winter*, 509 F.2d 975 (5th Cir. 1975), and a "United States court has jurisdiction over violations of narcotics statutes of the sort involved here, whose effectiveness necessarily depends on extraterritorial jurisdiction." *United States v. Vicars*, 467 F.2d 452, 456 (5th Cir. 1972).

██ While probable cause to search the vessel was not required, the fact that the vessel was violating the law by proceeding without lights at night was sufficient cause and authority to board the "Winds Will" pursuant to 14 U.S.C. §§ 2 and 89. Once on board, there was an "overpowering" aroma of marijuana which itself justified a search of the vessel. *United States v. Byrd*, 483 F.2d 1196 (5th Cir. 1973). Such search did not violate the Fourth Amendment.

The action of the United States Coast Guard vessel "Dauntless" stopping and boarding the defendant vessel was part of a program of systematic enforcement of the navigation and shipping laws and regulations of the United States which is periodically conducted by the Coast Guard. As a vessel of United States ownership and registry the defendant vessel was subject to the special Maritime jurisdiction of the United States even though she was located beyond the territorial waters of the United States. 18 U.S.C. § 7 (Supp.1974).

██ The marijuana on the defendant vessel was in plain view in a large green plastic bag in the vessel's galley. Addi-

tional marijuana was revealed to the Coast Guard by individuals on board pursuant to Coast Guard questions. The Coast Guard was properly aboard the vessel and present in the cabin under the express authority of 14 U.S.C. § 89(a) (Supp.1974) as well as other authority under domestic and international law discussed, *supra.* It is well settled that contraband which is in the "plain view" of an officer who is where he has a right to be may be seized. *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

Even if the marijuana had not been in plain view, the overpowering aroma of marijuana in the confined space of the defendant vessel's cabin would have justified further examination of the large bags on the basis of the doctrine approved in *United States v. Byrd, supra.* Since the Coast Guardsman's initial contact with the defendants and presence in the cabin of the defendant vessel is valid under a number of statutes and authorities discussed *supra,* it follows that the subsequent examination of the cargo based on the odor of marijuana emanating from the bags was valid under *Byrd.*

It is therefore:

Ordered and adjudged that Final Judgment of Forfeiture be entered in favor of the United States of America.