**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Braxton Lake FREEMAN, Lawrence John Graham, Peter Martell, a/k/a Pita, a/k/a Peter, Defendant-Appellee.**

No. 75–3909.

United States Court of Appeals,
Fifth Circuit.

Sept. 11, 1978.

Robert W. Rust, U. S. Atty., Rebekah J. Poston, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellant.

Pearson & Josefsberg, Daniel S. Pearson, Bruce S. Rogow, Miami, Fla., for defendant-appellee.

Before BROWN, Chief Judge, TUTTLE and TJOFLAT, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This case brings before this Court the increasingly vexatious difficulties created by man's quest for quick riches through smuggling. While on a routine patrol off the Florida coast, United States Customs Officers caught defendant Freeman with his hand on the rudder illegally attempting to bring aliens into the United States.[1] During the suppression hearing in the District Court, defendant Freeman contended that the Customs Officers violated the sanctity of the Fourth Amendment's prohibition against unreasonable searches and seizures and the trial judge agreed. Pursuant to 18 U.S.C. § 3731, the United States Government appeals the District Court's order granting the suppression motion. Recognizing the congressionally created, judicially approved, and constitutionally firm power of Customs Officers to board vessels within customs waters for the purpose of checking papers and documents, we reverse.

On April 30, 1975, a clear day with calm winds, Customs personnel on Customs Vessel 38116 (Vessel 38116) were patrolling the waters off southern Florida. Shortly after 8:00 a. m., Vessel 38116 approached the Miami sea buoy, located approximately three nautical miles offshore. At that time Customs personnel sighted on the horizon to the northeast the mast of the *Topographic Oceans,* a 37 foot Irwin sailboat. From its position near the Miami sea buoy, Vessel 38116 headed in a northerly direction. Customs Officers continuously followed for thirty to forty-five minutes the *Topographic Oceans* course from the west[2] toward the Florida coastline. When the Customs personnel made the initial sighting the *Topographic Oceans* was well beyond the three mile territorial limit.

Shortly before 9 a. m., Vessel 38116 intercepted the *Topographic Oceans* 2.8 miles off the Florida coast directly east of Bakers Haulover Inlet.[3] Once alongside, the Customs personnel inquired about the *Topographic Oceans's* last port of call. The only individuals on deck, defendants Freeman and Graham, both replied "West Palm Beach." After consulting among themselves, the Customs Officers decided to board the *Topographic Oceans.* They based their decision on the following considerations: (i) the *Topographic Oceans,* a sailboat, was heading in a westerly direction, (ii) the *Topographic Oceans* was crossing the Gulfstream which travels north, (iii) a similar vessel from West Palm Beach would normally travel south closer to the shoreline to avoid the Gulfstream, (iv) the time of the day, and (v) the presence on deck of two middle-aged men and the apparent absence of wives or other family members. The Customs Officers reasoned that it was illogical for such a sailing vessel supposedly

---

1. The indictment charged Freeman and a companion, Graham, with illegal alien trafficking under 8 U.S.C. § 1324(a) and 18 U.S.C. § 2.

2. During the suppression hearing, defendant Freeman stated that the course of the *Topographic Oceans* during this period was a southwesterly heading of 220°.

3. In attempting to reconstruct the passages of the two vessels, this Court utilized chart # 11466 of the National Oceanic & Atmospheric Administration which covers the area from Jupiter Inlet to Fowey Rocks on the southeast coast of Florida.

traveling from West Palm Beach to sail north to south against the northern flow of the Gulfstream. Instead, the passage would be closer to the shore out of the Gulfstream's influence.

As Customs Officers Sutton and McBride boarded the *Topographic Oceans,* Officer Sutton asked Freeman who was the vessel's master. Freeman responded that Graham, then on the bow of the boat, was the master. After Graham came from the bow of the vessel to the boarding party's location, Officer Sutton requested the vessel's documents. Graham indicated that his wife had placed them someplace below deck. Almost simultaneously with the receipt of this response, while standing on the deck, Customs Officer McBride glanced down through a wide-open door (hatch) to ascertain that no one with weapons was lurking below. He saw a woman holding a baby hiding in one corner and another woman hiding under a table.

This behavior aroused his suspicion and McBride proceeded down into the vessel. McBride also stated that he proceeded down the hatch to assure that no one with weapons was hiding. In the forward section of the sailboat McBride discovered a group of black men, women, and babies who, upon later investigation, were determined to be Haitian refugees. Subsequently, both defendants were "read their rights" and escorted along with the *Topographic Oceans* to the Coast Guard base in Miami.

At the suppression hearing the defense placed an expert witness on the stand who testified that anyone viewing the *Topographic Oceans* for less than half an hour could not draw a conclusion about its point of origin or its destination. The expert opined that any travel of a sailboat in the area observed by the Customs agents was consistent with "ordinary, normal, prudent seamanship coming from Palm Beach to Miami." The expert conceded, however, that the general direction of the vessel could have been discerned by the Customs Officers. Finally, he agreed that when first sighted by Customs officials, the *Topographic Oceans* was at least six miles from the Florida coast.

In granting Freeman's motion to suppress, the District Court made several rulings. First, the Court found that the search was not a border search. Alternatively, the Court ruled that even if the search was a border search, there existed no reasonable suspicion to stop the vessel and conduct a search. Finally, the Court ruled that the mere observation of a vessel crossing the three mile limit, standing alone, did not invoke the authority to search under the customs statute, 19 U.S.C. § 1581.

On appeal the Government seriously presses two arguments. First, the Government contends that the search was justified as a border search. Second, the Government argues that the search was a statutorily authorized customs search of a newly arrived vessel under § 1581.

In determining whether the Customs agents acted in a constitutionally acceptable manner we divide our analysis into two phases. First we examine the statutory and constitutional authority for the stop of the *Topographic Oceans.* Next, upon finding that the stop was constitutional, we inquire about the constitutionality of the search.

### Shipshape Statutory Authority

Through the enactment of 19 U.S.C. § 1581(a), Congress authorized Customs agents to stop vessels in Customs waters for the purpose of examining the vessel's manifest, documents and papers. Section 1581(a) explicitly provides that:

Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . and *examine the manifest and other documents and papers* and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle,

and use all necessary force to compel compliance.[4] (*Emphasis added.*)

Section 1401(j) defines "Customs waters," as to an American vessel, as "the waters within four leagues [12 nautical miles] of the coast of the United States." Clearly, the literal language of § 1581(a) supplies Customs Officers with extremely broad power.

■ We emphasize that in the present case no warrant issued and the Government does not contend that probable cause to stop or search the vessel existed at the moment of boarding. Moreover, we fully agree with the District Court's conclusion that the Customs personnel did not have reasonable suspicion to detain the vessel.[5] However, unlike the similar Customs statutory authority of 19 U.S.C. § 482 which contains a "reasonable cause to suspect" requirement,[6] § 1581(a) has no requirement which might limit the power granted Customs agents. Under the explicit language of § 1581(a) Customs Officers need not have even a modicum of suspicion to either stop or search vessels in Customs waters.

Clearly, under the authority granted by Congress, Customs Officers, within their discretion and for the purpose of examining the vessel's papers, could stop and board the *Topographic Oceans* as it sailed through Customs waters. The stop was plainly authorized by the literal language of the statute. The detention of the vessel under the authority granted by § 1581 was permissible unless violative of minimum federal Constitutional standards.

■ The Fourth Amendment[7] imposes a general reasonableness standard upon all searches and seizures. *See Carroll v. United States*, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; *Terry v. Ohio*, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *United States v. Caraballo*, 5 Cir., 1978, 571 F.2d 975; *United States v. Bowman*, 5 Cir., 1974, 502 F.2d 1215, 1218; *United States v. McDaniel*, 5 Cir., 1972, 463 F.2d 129, 134, *cert. denied*, 1973, 413 U.S. 919, 93 S.Ct. 3046, 39 L.Ed.2d 1041, cited in *United*

---

**4.** Similarly, 19 C.F.R. § 162.3 provides:

*Boarding and Search of Vessels*

(a) *General Authority.* A Customs officer, for the purpose of examining the manifest and other documents and papers and examining, inspecting and searching the vessel, may at any time go on board:

(1) Any vessel at any place in the United States or within the Customs waters of the United States . . . ..

**5.** In reaching its conclusion, the District Court phrased its inquiry in a way that fully supported its subsequent ruling. The District Judge stated the issue:

I think it does boil down exactly to the proposition of whether tomorrow two middle-aged men are seen in a sailboat out there on the waters somewhere coming toward land and they are out pretty far and they are asked: 'Where is port of call?' And they say: 'Well, West Palm Beach.' [Is that] reasonable suspicion to board the vessel?

**6.** Most landward Customs searches have been instituted under 19 U.S.C. § 482 which provides:

Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to

law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other persons so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charged, or by, in, or upon such vehicle, beast, or otherwise, he shall cease and secure the same for trial.

The United States Supreme Court recently affirmed the constitutionality of this statutory provision in *United States v. Ramsey*, 1977, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617.

**7.** *The Fourth Amendment provides:*

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and persons or things to be seized.

U.S.Const. amend. IV.

*States v. Ingham*, 5 Cir., 1974, 502 F.2d 1287, 1291 n.6, *cert. denied*, 1975, 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777. What is reasonable of course depends upon the circumstances of each case. *United States v. Rabinowitz*, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. The reasonableness and constitutionality of brief stops of vessels in Customs waters by Customs agents for the purpose of routine document and safety checks is beyond question. Precedent, the unique circumstances and problems of the maritime context, and the historical origin of § 1581 all dictate that document and safety inspections such as the one involved here are constitutionally reasonable.

First, no case holds that the stop of a vessel on the seas for a document or safety check is constitutionally proscribed by the Fourth Amendment. Indeed, our cases have upheld the right of Government agents to stop vessels for routine safety and document checks under the analogous statutory authority granted to the Coast Guard by 14 U.S.C. § 89(a).[8] *United States v. Warren*, 5 Cir., 1978, 578 F.2d 1058 (en banc); *United States v. Odom*, 5 Cir., 1976, 526 F.2d 339; *United States v. One 43 Foot Sailing Vessel*, 5 Cir., 1976, 538 F.2d 694. It would be anomalous to suggest that the nearly identical language of § 1581(a) does not afford Customs officers the constitu-

tionally acceptable authority to make document checks within the Customs waters.

Moreover, as we emphasized in *United States v. Ingham*, 5 Cir., 1974, 502 F.2d 1287, 1920, *cert. denied*, 1975, 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777, there is a substantial distinction between a landlocked vehicle and a nautical vessel for Fourth Amendment purposes. First, the national frontiers of the oceans are much more difficult to police than the territorial boundaries of the land. The exact lines are difficult to discern and there is no limit to the numbers of fixed points of entry. It's simply not practical to stop and inspect every vessel at the actual border, an imaginary line on the seas. Finally, the brief and routine Customs detention prompted by the legitimate concerns of government for the safe and lawful operation of vessels intrudes only minimally into the privacy of seafarers. *See generally United States v. Stanley*, 9 Cir., 1976, 545 F.2d 661, 667, *cert. denied*, 1978, —— U.S. ——, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978); *United States v. Hill*, 5 Cir., 1970, 430 F.2d 129, 131; Comment, 77 Yale L.J. 1007, 1011.

Finally, the authority embodied within § 1581 may be traced back to the commencement of the Republic when the First Congress statutorily granted Customs officials broad powers.[9] The historical signifi-

---

8.  (a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, *examine the ship's documents and papers*, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the Unit-

ed States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized. (Emphasis added).

14 U.S.C. § 89(a).

9.  Act of July 31, 1789, C.5 (§ 24) 1 Stat. 29, 43 provides:

*And be it further enacted*, That every collector, naval officer and surveyor, or other person specially appointed by either of them for that purpose, shall have full power and authority, to enter any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed; and therein to search for, seize, and secure any such goods, wares or merchandise; and if they shall have cause to suspect a concealment thereof, in any partic-

cance of the enactment of such Customs statutes by the same Congress which proposed the Fourth Amendment has been recognized by the Supreme Court. *United States v. Ramsey*, 1977, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617. Clearly, members of the First Congress regarded neither seizures nor searches of the kind authorized by § 1581 "unreasonable" or embraced by the prohibition of the Fourth Amendment. *See Boyd v. United States*, 1886, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746.

Accordingly, we conclude that the detention and boarding of the *Topographic Oceans* in Customs waters for the purpose of a document check was statutorily authorized and constitutionally permissible. We now examine the constitutionality of the search which flowed from the initial boarding and request to inspect the vessel's documents.

### The Search Of The Topographic Oceans

■ Once aboard the sailboat, Customs Officer Sutton requested the vessel's documents. Graham's response that the papers were stowed below deck caused Officer McBride to glance down through a wide-open hatch where he saw a woman holding a baby hiding in one corner and another woman hiding under a table. Because the Customs Officers had the right to board the *Topographic Oceans* and inspect her papers, Officer McBride had a right to be in the position from which he had a "plain view" of the hiding passengers. His inadvertent discovery of this manifestly suspicious activity furnished the Officers with probable cause for believing that a crime—the illegal smuggling of aliens—was in the process of being committed in their very presence. The sight of a woman holding a baby, trying to hide in the shadows of a corner, and of another woman crouching under a table

ular dwelling-house, store, building, or other place, they or either of them shall, upon application on oath or affirmation to any justice of the peace, be entitled to a warrant to enter such house, store, or other place (in the day time only) and there to search for such goods, and if any shall be found, to seize and secure the same for trial; and all such goods, wares and merchandise, on which the duties shall not have been paid or secured, shall be forfeited.

Act of August 4, 1790, C.35 (§ 31) 1 Stat. 145, 164 provides:

*And be it further enacted,* That it shall be lawful for all collectors, naval officers, surveyors, inspectors, and the officers of the revenue cutters herein after mentioned, to go on board of ships or vessels in any part of the United States, or within four leagues of the coast thereof, if bound to the United States, whether in or out of their respective districts, *for the purposes of demanding the manifests* aforesaid, and of examining and searching the said ships or vessels; and the said officers respectively shall have free access to the cabin, and every other part of a ship or vessel: and if any box, trunk, chest, cask, or other package, shall be found in the cabin, steerage or forecastle of such ship or vessel, or in any other place separate from the residue of the cargo, it shall be the duty of the said officer to take a particular account of every such box, trunk, cask or package, and the marks, if any there be, and a description

thereof; and if he shall judge proper to put a seal or seals on every such box, chest, trunk, cask or package; and such account and description shall be by him forwarded to the collector of the district to which such ship or vessel is bound. And if upon her arrival at the port of her entry, the boxes, trunks, chests, casks or packages so described, or any of them shall be missing, or if the seals put thereon be broken, the master or commander of such ship or vessel shall forfeit and pay for every such box, trunk, chest, cask or package so missing, or of which the seals shall be broken, two hundred dollars. And it shall also be lawful for the inspectors who may be put on board of any ship or vessel, to secure after sunset in each evening, the hatches and other communications with the hold of such ship or vessel, with locks or other proper fastenings, which fastenings shall not be opened, broken or removed, until the morning following, or after the rising of the sun, and in presence of the inspector or inspectors by whom the same shall have been affixed, except by special license from the chief officer of the port. And if the said locks or other fastenings, or any of them, shall be broken or removed during the night, or before the said rising of the sun, or without the presence of the said inspector or inspectors, the master or person having the charge or command of such ship or vessel, shall forfeit and pay the sum of two hundred dollars.

on a sailboat supposedly heading from West Palm Beach, was sufficiently suspicious to provide probable cause to search below deck. The officer who went below immediately discovered the numerous Haitian passengers. Consequently, the discovery of the suspicious activity and the resultant probable cause that arose fell within the justification afforded by the plain view doctrine. *See United States v. McDaniel*, 5 Cir., 1977, 550 F.2d 214, 218; *Thompson v. Stynchcombe*, 5 Cir., 1974, 494 F.2d 49; *United States v. Green*, 5 Cir., 1973, 474 F.2d 1385, 1389; *United States v. Ragsdale*, 5 Cir., 1972, 470 F.2d 24, 26 and n.2.

The warrantless search of the *Topographic Oceans* was constitutionally permissible because of the combination of probable cause and the exigent circumstances attendant to a moving vessel. *Carroll v. United States*, 1925, 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543. *Cf. Katz v. U. S.*, 1967, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576; *United States v. Warren*, 5 Cir., 1978, 578 F.2d 1058. Moreover, it was the mere demand to inspect the vessel's documents which precipitated the probable cause and ultimate discovery of the illegal aliens. Accordingly, the search was constitutionally justified by the plain view and exigent circumstances probable cause exception to the Fourth Amendment warrant requirement.

### Taffrail Remarks

■ We hold that the Fourth Amendment allows Customs agents, acting under the authority conferred them by § 1581, to board vessels within customs waters for the purpose of conducting routine document checks. *See also* 14 U.S.C. § 89(a). The brief detention resulting from routine administrative inspections of this kind do not violate the Constitution. Furthermore, we conclude that Customs agents, having boarded a vessel to check documents, may subsequently search the vessel where the observations of the lawfully present agents rise to the level of probable cause to search as was the case here.

Under the facts of this case, we find no need to determine what geographical limitations the Fourth Amendment places on searches made pursuant to § 1581(a).[10] Nor need we decide, under the facts of this case, whether *Almeida-Sanchez*, 1973, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596, is applicable to the unique context of the maritime customs search.[11] The discretionary § 1581(a) customs detention and boarding of a vessel in customs waters for the purpose of a routine document check is amply justified by Fourth Amendment principles.

REVERSED and REMANDED.

10. Section 1581(a) authorizes discretionary searches of vessels "at any place in the United States." Thus, on its face § 1581(a) provides no spatial limitation on the power to search. Because of the manner in which we decide the present case, we need not decide whether such broad power to search without probable cause conflicts with the Fourth Amendment.

The Ninth Circuit has concluded, however, that strict application of the literal language of the statute would subvert the Fourth Amendment. *United States v. Jones*, 9 Cir., 1975, 528 F.2d 303, 304, *cert. denied*, 1976, 425 U.S. 960, 96 S.Ct. 1745, 48 L.Ed.2d 206. Similarly, in a non-maritime, aerospace context we have clearly indicated that a literal reading of the customs search statute would lead to patent unconstitutionality. *United States v. Brennan*, 5 Cir., 1976, 538 F.2d 711, 719 n.9, *cert. denied*, 1977, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538.

11. Although we reserve the question whether *Almeida-Sanchez* applies in an admiralty context, we point out that the Ninth Circuit has clearly adopted *Almeida-Sanchez* to § 1581(a) searches. *United States v. Stanley*, 9 Cir., 1976, 545 F.2d 601, 667, *cert. denied*, 1978, —— U.S. ——, 98 S.Ct. 2661, 56 L.Ed.2d 757 (1978); *United States v. Tilton*, 9 Cir., 1976, 534 F.2d 1363, 1366. Analogously, we have recently said that *Almeida-Sanchez* applies to customs searches at airports. *United States v. Brennan*, 5 Cir., 1976, 538 F.2d 711, 716–19, *cert. denied*, 1977, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538.