UNITED STATES of America,
Plaintiff-Appellant,

v.

John Walter PINER and Salvatore Joseph Gallina, Defendants-Appellees.

No. 78–2565.

United States Court of Appeals,
Ninth Circuit.

Sept. 5, 1979.

Floy E. Dawson, Asst. U. S. Atty., San Francisco, Cal., on brief; Sanford Svetcov, Asst. U. S. Atty., San Francisco, Cal., argued, for plaintiff-appellant.

Joel A. Shawn (argued), Kipperman, Shawn, Kecker & Brockett, San Francisco, Cal., on brief; Kim S. La Valley, San Francisco, Cal., argued, for defendants-appellees.

Before MERRILL and KENNEDY, Circuit Judges, and KING,* District Judge.

* Honorable Samuel P. King, Chief United States District Judge of the District of Hawaii, sitting by designation.

MERRILL, Circuit Judge:

The question presented here is whether the boarding by the Coast Guard of a boat in San Francisco Bay for a routine document and safety inspection, without warrant and without probable cause to believe or founded suspicion that a violation of the law had occurred, was a reasonable search under the Fourth Amendment.

On the basis of marijuana seized on board their boat, appellees were indicted for importation of marijuana, possession with intent to distribute and conspiracy to import and distribute, in violation of 21 U.S.C. §§ 952(a), 841(a)(1), 963 and 846. Their motion to suppress as evidence the seized marijuana was granted by the district court and this appeal was taken by the government under 18 U.S.C. § 3731. We affirm.

On the evening of January 12, 1978, a United States Coast Guard cutter was cruising the waters of San Francisco Bay on a routine patrol. At approximately 6:30 p.m. the crew spotted the running lights of appellees' 43-foot sailboat, the "Delphene," and the decision to board was made. It was stipulated that the only purpose for stopping and boarding was for "a routine safety inspection," that it was done "on a random basis," and that "there were no suspicious circumstances." The "Delphene" was hailed; the cutter was identified as Coast Guard and the "Delphene" was instructed to prepare to be boarded. On board the "Delphene" the boarding officer displayed his credentials and advised that his boarding was for a routine safety inspection. At the same moment he observed through an open door what appeared to be bags of marijuana, in plain view in a lighted cabin below the deck. He immediately placed appellees under arrest. The boat was seized and a thorough search was conducted. Over two tons of marijuana were recovered.

Under 46 U.S.C. § 1454 the secretary of the department in which the Coast Guard operates [1] is assigned the duty of issuing regulations establishing minimum safety standards for boats. Under 14 U.S.C. § 2 the Coast Guard is assigned the duty to "administer laws and promulgate and enforce regulations for the promotion of safety of life and property on the high seas and on all waters subject to the jurisdiction of the United States * * *." The express statutory authority for boarding is 14 U.S.C. § 89(a), which provides in part:

"The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance."

The record establishes by affidavit of a Coast Guard commander that safety inspection of a pleasure boat under applicable regulations consists of the following:

(1) Stopping and boarding of the boat.

(2) Checking boat registration papers and personal identification of the boat owner.

(3) Inspecting the boat for number, condition and storage of life jackets and fire extinguishers.

(4) Inspecting the engine for backfire flame arrestor, closed compartments for proper ventilation ducts, and bilges for spilled oil or fuel to prevent explosion and fire.

While dockside inspection of commercial craft is feasible, since such craft are subject to rigorous safety regulations with compliance required at all times, in the case of pleasure boats the requirements are less burdensome. The modest equipment requirements apply only when the boat is in

---

1. The Coast Guard, formerly under the authority of the Treasury Department, now is a service under the Department of Transportation. 14 U.S.C. § 1.

use. 33 C.F.R. §§ 175.1 and 177.01. Life jackets and fire extinguishers may be stored at home, relatively safe from theft, when the boat is not in use. Accordingly, it is the Coast Guard practice to inspect such craft only when they are underway.

Random boarding of boats by the Coast Guard under § 89(a) has been upheld by the Fifth Circuit sitting en banc. *United States v. Warren,* 578 F.2d 1058 (5th Cir. 1978). There it was held that as to American Flag vessels located outside the 12-mile limit the boarding need not be founded on any particularized suspicion, and that once having boarded the Coast Guard may conduct documentation and safety inspections. *Id.* at 1064–65. The similar authority of customs officers under 19 U.S.C. § 1581 was recognized in *United States v. Freeman,* 579 F.2d 942, 946 (5th Cir. 1978).

Here, the district court held that the random stop and search violated the Fourth Amendment on the authority of *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); and *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). Those cases dealt with the question of whether a search conducted without warrant could be upheld because of the particular need for and nature of an administrative search. The appeal in this case centered on that question, the government contending that lack of warrant was excused under *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) and *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).

After argument in this case the Supreme Court decided *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). *Prouse* dealt with whether an inspection stop and search, lawful without warrant, is nevertheless unreasonable if there is no probable cause to believe or founded suspicion that a violation is in progress and if choice of the decision to stop and search is left to the sole discretion of the officer in the field. We called for further briefing as to the effect of that decision.

*Prouse* dealt with the random stop of an automobile by state police for a check of driver's license and registration. In discussing the constitutionality of the stop the court noted that the effect of the Fourth Amendment is "to impose a standard of 'reasonableness' upon the exercise of discretion by government officials." 440 U.S. at 653–54, 99 S.Ct. at 1396. As to the proper test the court stated:

"[T]he permissibility of a particular law-enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 654, 99 S.Ct. at 1396.

Delaware contended that "the State's interest in discretionary spotchecks as a means of ensuring the safety of its roadways outweighs the resulting intrusion on . . . privacy . . ." *Id.* at 655, 99 S.Ct. at 1397.

This the Court rejected. On the record before it, the Court could not say that a spot check is "a sufficiently productive mechanism to justify the intrusion . ." *Id.* at 659, 99 S.Ct. at 1399. It noted that checkpoint stops were available as an alternative, citing *United States v. Martinez-Fuerte,* 428 U.S. 543, 558, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), where the Court noted that such stops were less intrusive than the random stop of a single car: " 'the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop.' " 440 U.S. at 656, 99 S.Ct. at 1397. It quoted *United States v. Ortiz,* 422 U.S. 891, 894–95, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) as saying " 'At traffic checkpoints, the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority and he is much less likely to be frightened or annoyed by the intrusion.' " 440 U.S. at 657, 99 S.Ct. at 1398. The Court in *Prouse* ruled, "Given the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution to highway

safety of the random spotcheck justifies the practice under the Fourth Amendment." *Id.* at 659, 99 S.Ct. at 1399.

The government contends that *Prouse* is distinguishable on many grounds including the fact that checkpoint stops at sea are not practicable and that data here support the usefulness of random stops.[2] It points to the long history of Coast Guard boarding authority and notes that stops without probable cause or suspicion are expressly authorized by Congress and are the subject of Coast Guard regulations. It asserts that random stops are the only practicable means of ascertaining pleasure craft compliance with safety regulations, and that without authority to conduct random stops the congressional purpose of maritime safety will, in the case of pleasure craft, be frustrated.

These contentions are forceful, and they pose difficult questions regarding the reasonableness of random stops by the Coast Guard. However, under the facts of this case we do not find it necessary to answer them. Instead we assume, *arguendo,* that the governmental interest in securing compliance with safety regulations outweighs the intrusion on privacy encountered in the ordinary boarding.

However, we note that a concept of subjective intrusion was introduced by the Court in *Martinez-Fuerte* and elaborated on in *Prouse.* The Court acknowledged in those cases and in *Ortiz* that a police stop of an individual automobile may have a particularly unsettling effect upon the ordinary person. And we believe that under *Prouse* it is the weight of this subjective intrusion that must be balanced against the governmental need. If the stop of an automobile upon a public highway by an identifiable police car is felt to create such subjective intrusion as to require the use of potentially less intrusive alternatives, surely the stop of an isolated boat after dark, followed by a physical intrusion upon the boat itself, would have an unsettling effect immeasur-

ably greater, placing a far greater demand upon the government to come forward with balancing factors.

If the purpose of the random stop is to ascertain and discourage noncompliance with safety regulations, we see no reason why this purpose cannot sufficiently be accomplished during the daylight hours. Thus, reliance on this less intrusive means eliminates the need for stops and boardings after dark where no cause to suspect noncompliance exists.

■ We conclude that the random stop and boarding of a vessel after dark for safety and registration inspection without cause to suspect noncompliance is not justified by the governmental need to enforce compliance with safety regulations and constitutes a violation of the Fourth Amendment. A stop and boarding after dark must be for cause, requiring at least a reasonable and articulable suspicion of noncompliance, or must be conducted under administrative standards so drafted that the decision to search is not left to the sole discretion of the Coast Guard officer.

The order suppressing the marijuana as evidence is affirmed.

KENNEDY, Circuit Judge, dissenting:

I respectfully dissent from this holding, which invalidates authority that has been exercised, and accepted as correct, for almost two hundred years. In addition, this case puts the Ninth Circuit directly at odds with the Fifth Circuit. *See United States v. Postal,* 589 F.2d 862, 889 (5th Cir. 1979), *petition for cert. filed,* 47 U.S.L.W. 3829 (U.S. Apr. 14, 1979) (No. 78–1714); *United States v. Freeman,* 579 F.2d 942, 946–47 (5th Cir. 1978); *United States v. Warren,* 578 F.2d 1058, 1064–65 (5th Cir. 1978) (en banc). The facts are not in dispute, and this case presents the single issue of the constitutionality of random safety checks by the Coast Guard of pleasure craft being operated within United States territorial waters.

**2.** It appears from the record that in 1977, 330,-534 pleasure craft were registered in the San Francisco Bay area and 3,245 were boarded by the Coast Guard, of which 40 percent were found not to be in compliance with safety regulations.

*Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) is not dispositive of the issue here. *Prouse* does not establish a rule against all random stops; it concerns automobiles only. In reaching its conclusion in *Prouse,* the Court "balanc[ed] the public interest against the individual's Fourth Amendment interests." *Id.* at 657, 99 S.Ct. at 1397–98. Random safety checks of vessels by the Coast Guard present considerations very different from random automobile stops, and a different rule is therefore required. *Cf. id.* at 664, 99 S.Ct. 1391. (Blackmun, J., concurring) (random inspections by game wardens not foreclosed by *Prouse* ).

In *Prouse,* the case turned on the facts (or lack of them) concerning the effectiveness of random stops. The Court noted that "the percentage of all drivers on the road who are driving without a license is small and that the number of licensed drivers who will be stopped in order to find one unlicensed operator will be large indeed." *Id.* at 659–60, 99 S.Ct. at 1399. From this the Court concluded that "the spot check does not appear sufficiently productive to qualify as a reasonable law-enforcement practice." *Id.* at 600. With respect to minimum vehicle safety requirements, the Court noted that many violations are observable and further that vehicle safety is effectively policed through the requirement of an annual safety inspection. Finally, the Court suggested that road block-type stops would be a permissible alternative to random stops.

This case is quite different from *Prouse.* Unlike automobile stops, random Coast Guard safety checks are a highly effective means of discovering safety violations. In 1977, the Coast Guard boarded 3,245 pleasure craft in the San Francisco Bay area for safety checks; of those, 40% were found to be not in compliance with safety regulations. In further contrast to automobiles, most of the essential items of safety equipment, *i. e.,* life preservers, engine flame arrestors, horns, and fire extinguishers, are not observable without boarding the vessel because this equipment is primarily found or properly kept below deck.

Finally, the less intrusive alternatives of the type dispositive in *Prouse,* such as annual inspections and road block-type stops, are not available in this case. This case involves a pleasure boat, and the controlling safety regulations only apply to pleasure boats when in use. 46 U.S.C. § 1461(c). This permits the boat owner to store the removable safety devices at home where they are safer from theft and the elements until he is ready to go sailing. Dockside inspection of a boat is therefore completely ineffective. Moreover, the alternative of a roadblock stop is unavailable on the water; there are no roads and generally no convenient thoroughfares to block. The sea does not lend itself to a safe, orderly queue for the systematic check of vessels. Whereas automobiles can be safely parked in a line on a solid, nonmoving surface, vessels are, by their nature, forced to contend with the vagaries of sea, wind, current, and oceanographic conditions, all constantly in a state of flux. And from the law enforcement standpoint, the possibility of vessels entering or leaving international waters from a vast coastal domain presents a much greater problem than that presented by vehicles which, generally speaking, can cross international borders only at manned checkpoints. In the instant case a seagoing vessel was stopped just a few miles from the Golden Gate Bridge.

The majority offers a less intrusive alternative, that is, to conduct these safety checks during the day. Even aside from the obvious impracticality of the suggestion as a means of enforcing inspection against the willful violators, this novel theory ignores the fact that safety violations at night may be more dangerous than those during the day—dangerous both to passengers and to those who may be called upon to effect a rescue. Further, I think it important to note that in this case the boat was not anchored but was underway. Searches at night may be more intrusive because they raise the specter of uniformed officers rousing people from their sleep. But where the boat is underway, it is clear that someone is, or ought to be, awake.

My conclusion is that *Prouse* does not control this case and that we must turn instead to other sources. Based on the historical acceptance of Coast Guard document and cargo inspections of vessels and based also on the special rules that apply to certain administrative searches, *see United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), I would hold that random safety checks of vessels are not unreasonable within the meaning of the fourth amendment.

The Fifth Circuit has concluded, it seems, that it is constitutional for the Coast Guard to board vessels to conduct documentation and safety checks without probable cause or particular suspicion. *See United States v. Postal,* 589 F.2d 862, 889 (5th Cir. 1979), *petition for cert. filed,* 47 U.S.L.W. 3829 (U.S. Apr. 14, 1979) (No. 78–1714); *United States v. Freeman,* 579 F.2d 942, 946–47 (5th Cir. 1978); *United States v. Warren,* 578 F.2d 1058, 1064–65 (5th Cir. 1978) (en banc).[1]

Statutory authority for boarding is granted in explicit terms by 14 U.S.C. § 89(a) which permits Coast Guard officers to *"at any time* go on board of *any* vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel" (emphasis added). The statute imposes no requirement that a search be based on probable cause or even on a reasonable suspicion. *See United States v. Warren,* 578 F.2d 1058, 1065–66 (5th Cir. 1978) (en banc). *Cf. United States v. Freeman,* 579 F.2d 942, 945 (5th Cir.

1978) (interpreting similar language of 19 U.S.C. § 1581(a)).

The powers of the Coast Guard to board vessels originated in the First Congress. Section 31 of the Revenue Cutter Service Act provide:

That it shall be lawful for all collectors, naval officers, surveyors, inspectors, and the officers of the revenue cutters . . . to go on board of ships or vessels in any part of the United States, or within four leagues of the coast thereof, if bound to the United States, whether in or out of their respective districts, for the purposes of demanding the manifests aforesaid, and of examining and searching the said ships or vessels; and the said officers respectively shall have free access to the cabin, and every other part of a ship or vessel . . . . .

1 Stat. 164 (1790). *See* 1 Stat. 315 (1793). This statute places no limitations on the power of inspectors to board and search vessels and, because it was an enactment of the same Congress which proposed the fourth amendment, is of great significance. In *United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), the Supreme Court, in holding that border searches made without warrant or probable cause are "reasonable" within the meaning of the fourth amendment, cited similar enactments of the First Congress and placed great reliance on the understanding of that body as to the scope of the fourth amendment. *See Boyd v. United States,* 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

The determination by the First Congress of the constitutionality of certain vessel searches without probable cause or suspicion has continued to modern times.[2] The

---

1. These cases generally support that proposition by mere citation to two previous Fifth Circuit cases, *United States v. One 43 Foot Sailing Vessel,* 538 F.2d 694 (5th Cir. 1976), and *United States v. Odom,* 526 F.2d 339, 341–42 (5th Cir. 1976), which do not include any discussion of the possible constitutional problems of a random boarding that is not based on reasonable suspicion. In *One 43 Foot Sailing Vessel,* the Fifth Circuit affirmed on the basis of the district court opinion. *United States v. One 43 Foot Sailing Vessel,* 405 F.Supp. 879

(S.D.Fla.1975). The district court opinion includes a brief constitutional analysis, in which the court holds only that a warrant or probable cause are not required. Because the court concludes that the Coast Guard had cause for searching the vessel, it did not reach the issue of whether some particular suspicion is necessary. 405 F.Supp. at 883.

2. The statutory history is traced in Carmichael, *At Sea with the Fourth Amendment,* 32 U.Miami L.Rev. 51 (1977).

1790 provision remained essentially unchanged until 1866 when Congress enacted an anti-smuggling law. 14 Stat. 178 (1866). That statute, like section 31 before it, permitted customs officers "to go on board *any* vessel . . . and to inspect, search and examine the same." *Id.* at § 2 (emphasis added). Significantly, the Act made a distinction between searches of vessels and searches of the landlocked counterparts of vessels. Unlike the unqualified authority of officials to stop and search vessels, their authority to "stop, search, and examine . . . any vehicle, beast or person" was limited to cases where the official "shall suspect" a customs violation, and trunks or envelopes could be opened only where there was "reasonable cause to suspect" a violation. *Id.* at § 3.

The view that vessels are not entitled to the same fourth amendment protections as their landlocked counterparts was reasserted in a concurrence by Justices Brandeis and Holmes:

> There is no limitation upon the right of the sovereign to seize without a warrant vessels registered under its laws, similar to that imposed by the common law and the Constitution upon the arrest of persons and upon the seizure of "papers and effects."

*Maul v. United States,* 274 U.S. 501, 524, 47 S.Ct. 735, 744, 71 L.Ed. 1171 (1927) (Brandeis, J., concurring). Several years later, in enacting the predecessor of 14 U.S.C. § 89(a), Act of June 22, 1936, ch. 705, 49 Stat. 1820, Congress specifically relied on the Brandeis-Holmes concurrence, *see* H.R. Rep. No. 2452, 74th Cong., 2d Sess. (1936).

The unbroken chain of 200 years of authorization for the Coast Guard to board vessels to examine their documents and cargo without the requirement of a warrant, probable cause or particular suspicion is, I submit, persuasive authority for the reasonableness of such boardings, authority that is not overcome by the reasoning of the majority. *See Colonnade Catering Corp. v. United States,* 397 U.S. 72, 75, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).

In addition, however, I think that Coast Guard document and safety checks fall within the exception for administrative searches delineated in *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), and *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). At issue is an important government objective of insuring safety. Inspection of pleasure boats while in use is crucial to the regulatory scheme. Because most of the safety devices in question are not visible to a passing vessel, even the requirement of a particular suspicion would completely frustrate the scheme. Moreover, as in *Biswell,* in order for inspections of pleasure craft to be an effective deterrent to violation of safety requirements, unannounced inspections of boats in use are essential. *See* 406 U.S. at 316, 92 S.Ct. 1593. This is an area which historically has been subject to federal regulation.

Finally, I do not believe that in this case the safety check constituted a substantial invasion of privacy. As the Fifth Circuit has pointed out, search of certain portions of a vessel, such as the crew's quarters on an ocean-going tanker or a locked compartment on the bridge, may constitute substantial invasions of privacy. *See United States v. Whitmire,* 595 F.2d 1303, 1312 (5th Cir. 1979); *United States v. Whitaker,* 592 F.2d 826, 830 (5th Cir. 1979). This case, however, does not require us to delineate those areas of the vessel the officer may properly enter to conduct a safety or document check. Here, once the officer boarded the vessel, the evidence was in plain view. I do not believe that by merely stepping onto the exposed decks of the boat the Coast Guard officer invaded an area in which the defendants had a legitimate expectation of privacy. *See United States v. Odneal,* 565 F.2d 598, 601 (9th Cir.), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1977). Two hundred years of history make it plain that there is no legitimate expectation of privacy in this instance.

For these reasons, I would Reverse.