OPINION OF THE COURT
Joseph Jaspan, J.
The defendants are charged with criminal possession of approximately 14,000 pounds of marihuana (Penal Law, § 221.30) which was found aboard a large sailboat of foreign *1002 registry manned by them and was at the time moving in a westerly direction just north of Gardiners Island within the territorial waters of the United States.
They seek to dismiss the one count indictment on the ground that their vessel was in distress and only seeking a safe harbor at the time it was boarded and seized and was therefore immune from such action and consequential prosecution.
In the alternative, the defendants urge that, in any event, the boarding and search without a warrant constituted a violation of their Fourth Amendment rights and that title 14 (§ 89, subd [a]) of the United States Code under which the Coast Guard presumed to act is unconstitutional.
FACTS
The following is a summary of the events surrounding the search and seizure of the Scott Bader on October 2, 1978 based upon the testimony given before the Grand Jury by a number of witnesses including the defendant Nissen and upon the moving papers of the defendants.
At approximately 6:00 p.m. on October 2, 1978 the Coast Guard cutter Point Wells left on a law enforcement patrol from Montauk Point, Long Island. At approximately 7:25 p.m. Executive Petty Officer Keller saw the silhouette and red (port, left side) running light of a large sailboat heading in a westerly direction. Thereafter, the cutter moved closer and by observation determined that it was the Scott Bader from Cayman Islands, British Bahamas. At this time it was also noted that the vessel was riding heavy in the water although a blue water line was spotted periodically through the waves. The Point Wells then moved off to the Scott Bader’s starboard quarter from which point it appeared that neither the green starboard nor the masthead lights were visible and that the stern light was extremely dim.
Keller testified that these running lights are important to navigation so that approaching vessels may determine which side they are looking at and what action to take or direction to travel. Keller also testified that without lights emanating from starboard you cannot, without artificial light, determine the identity of the boat.
A determination was then made to board the Scott Bader, which was under both power and small sail. The Point Wells *1003 identified itself and told the occupants to prepare to be boarded.
At that time, the Scott Bader was .6 miles from the Gardiners Island ruins and approximately 1.8 miles north of Gardiners Island Point itself.
Gardiners Island is located within Suffolk County in the waters between Montauk and Orient Point astride the entrance to Gardiners Bay and Peconic Bay.
After hailing the Scott Bader, the cutter throttled back and got into position for the boarding. Nissen was on deck at this time. Keller identified himself and said that he was coming aboard to see if he complied with the Federal law. Nissen asked, "Is this a safety inspection?” and Keller answered, "Well, I want to see if you have complied with all of the federal law pertaining to equipment and paper”.
At the time of the boarding, the Scott Bader was 1.1 miles southwest of the ruins and 1.6 miles northwest of Gardiners Island Point. The testimony indicates that it was headed to Cherry Harbor (apparently Cherry Hill Point) located on the west side of Gardiners Island.
Upon boarding, Nissen identified himself as the skipper and was asked for his documents. Nissen went forward to the cabin and Keller remained at the cabin entrance. While standing near the cabin entrance, Keller noticed the strong aroma of what he believed to be marihuana. (Keller also testified to his expertise in the field of narcotics.) Nissen got the documentation, and as it was dark outside suggested that Keller come below and use the light on the chart table. Thereafter, as Nissen went to get identification papers, Keller observed 12 to 15 rectangular burlap bales. When Nissen returned he was given his Miranda warnings by Keller who then cut open a burlap sack and the underlying plastic and found marihuana. Nissen was arrested. Subsequently, Van Horn, who was also aboard, was arrested and given his Miranda warnings. The Scott Bader was taken to Montauk Station where 304 bales of marihuana were unloaded and delivered to the Drug Enforcement Agency who subsequently turned them over to the Suffolk police.
Defendants contend, however, that this safety stop was nothing more than a pretext and that the evidence in this case was obtained by law enforcement officials whose only purpose in boarding defendants’ vessel was to look for narcotics violations. Defendants’ position is that the Coast Guard did *1004 not immediately board but kept defendants’ vessel under continuous surveillance for a period of approximately 25 minutes until they communicated with the Drug Enforcement Agency and learned that at some time in the past defendants’ vessel had appeared on a "hot list” of vessels suspected of being used to transport contraband. It is alleged that upon boarding defendants’ vessel, these officers began an extensive and highly intrusive search of the vessel and that the search and the inquiries directed to the defendants were in no way connected with a safety and document inspection.
THE SAFE HARBOR THEORY
A foreign vessel has the right to enter the territory of a State when such entry is necessary for the safety of the vessel or persons aboard and to leave the territory once the conditions that made the entry necessary have ceased to exist (Restatement, Foreign Relations Law of the United States 2d, §48).
This right of entry for reasons of force majeure entitled the foreign vessel to claim, as of right, an entire immunity from the local jurisdiction (Jessup, Law of Territorial Waters and Maritime Jurisdiction, Kraus Reprint Co., New York, 1970).
No importation occurs within the meaning of the duty statutes "[wjhere goods are brought by superior force or, by inevitable necessity, into the United States”. (The Brig Concord, 9 Cranch [13 US] 387, 388.)
The necessity must be urgent and not merely a matter of convenience and the entry must be bona fide and made without intent to evade the laws of the host State (The New York, 3 Wheat [16 US] 59; Latham v United States, 2 F2d 208).
A factual issue is presented by the claim of the defendants that they required a safe harbor. The parties agree that this. threshold question of jurisdiction should be presented to the trial jury for resolution within the framework of the rules set forth above.
However, before reaching that area of dispute, there must be a determination of the search and seizure questions raised by this motion.
For the purpose of setting forth the applicable principles, the court has adopted the fact pattern evident in the Grand Jury minutes and defendants’ papers. These are not formal findings of fact because no hearing has been held and to the *1005 extent they are contested, the parties will be given the opportunity to present evidence and argue the legal consequences of that presentation.
THE SEARCH AND SEIZURE
The defendants urge that title 14 (§ 89, subd [a]) of the United States Code is unconstitutional since it permits the Coast Guard, without a warrant, to "make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States.”
A State court of general jurisdiction may rule upon the constitutionality of a Federal statute. (Larkin v Putnam’s Sons, 14 NY2d 399; Central Sav. Bank in City of N. Y. v City of New York, 280 NY 9, cert den 306 US 661; Lewis v American Federation of Tel. & Radio Artists, 71 Misc 2d 253, mod on other grounds 34 NY2d 265, cert den 419 US 1093.)
They contend that the recent decision in Marshall v Barlow’s (436 US 307), precluding a warrantless administrative search of a nonpublic work area of an employment facility (Occupational Safety and Health Act of 1970) sets a new standard and is controlling under the operative facts in this case.
But the very language of the Supreme Court opinion indicates that the rule in Marshall is not universal in its application to administrative searches. The opinion includes this telling language (p 321): "The reasonableness of a warrantless search, however,, will depend upon the specific enforcement needs and privacy guarantees of each statute.”
The Fourth Amendment protects people, not places (Katz v United States, 389 US 347) and the expectation of privacy must be reasonable and justifiable. (Cardwell v Lewis, 417 US 583.)
The interaction of many variables determines the reasonableness of the search (United States v Ivey, 546 F2d 139, cert den sub nom. Taglione v United States, 431 US 943). Thus the nature and limit of the intrusion (Adams v Williams, 407 US 143), the extent of the public interest (United States v Brignoni-Ponce, 422 US 873), the exigencies of the situation (Katz v United States, supra), as well as the expectancy of privacy must all be considered.
A warrantless search has been found valid in the case of *1006 "stop and frisk” (Terry v Ohio, 392 US 1), a border search for illegal aliens (United States v Brignoni-Ponce, supra), entry into a house by police in hot pursuit of an armed robber (Warden v Hayden, 387 US 294), or to prevent the imminent destruction of evidence (Ker v California, 374 US 23).
Similarly, warrantless searches and seizures have been sustained in emergency situations such as the seizure of tainted food (North Amer. Stor. Co. v Chicago, 211 US 306), the ordering of a health quarantine (Campagnie Francaise v Board of Health, 186 US 380), and the requiring of compulsory smallpox vaccinations (Jacobson v Massachusetts, 197 US 11). Additionally, an exception to the search warrant requirement has been recognized for "pervasively regulated” businesses such as the firearms industry (United States v Biswell, 406 US 311, 316), and for "closely regulated” industries "long subject to close supervision and inspection” such as the liquor industry (Colonnade Catering Corp. v United States, 397 US 72, 74, 77).
A vessel entering United States waters can reasonably expect to be subject to inspection to ensure compliance with the United States customs law (US Code, tit 19, § 1581, subd [a]), immigration laws (US Code, tit 8, § 1357) and safety standards (US Code, tit 14, § 89, subd [a]) and an antismuggling statute (US Code, tit 19, § 1701). In view of the mobility of a vessel, the public interest in its contents when moving from foreign waters into United States jurisdictional area and the interests of safe navigation, a rational basis exists for a finding that a law authorizing the Coast Guard under proper circumstances to board a vessel without a warrant is not unconstitutional.
The right of the Coast Guard to detain a vessel for the purpose of informing the crew of observed safety hazards (poor rigging and dragging halyard lines) and completing a safety and document inspection has been upheld. (United States v Odneal, 565 F2d 598, cert den 435 US 952.)
The Court in Odneal wrote (p 601): "Neither owners of vessels nor crews that are aboard vessels plying waters subject to the jurisdiction of the United States have any reasonable expectation of privacy that would exclude temporary detention by the Coast Guard for the limited purposes of checking registration and alerting the crew to hazardous conditions of the type that the Coast Guard observed in this case.”
United States v Warren (550 F2d 219, reh den 558 F2d 605, *1007 revd on the facts en banc 578 F2d 1058) expressly held title 14 (§ 89, subd [a]) of the United States Code to be constitutional and in support of that conclusion cites United States v One (1) 43 Foot Sailing Vessel (405 F Supp 879, affd 538 F2d 694).
In United States v Freeman (579 F2d 942, 946) the court wrote: "[N]o case holds that the stop of a vessel on the seas for a document or safety check is constitutionally proscribed by the Fourth Amendment.”
Thus, this court finds that title 14 (§ 89, subd [a]) of the United States Code empowers the Coast Guard to make warrantless safety and document inspections when it has before it facts which reasonably establish that safety violations or other hazardous conditions exist and that the opinion in Marshall v Barlow’s (436 US 307, supra), does not mandate a contrary holding.
However, no act of Congress can authorize a violation of the Constitution (Almeida-Sanchez v United States 413 US 266, 272). Therefore, inquiry must be made to determine whether the exercise of authority pursuant to the safety statutes was consistent with the Fourth Amendment’s prohibition against unreasonable searches and seizures (United States v Tilton, 534 F2d 1363, 1364).
The right to stop a vessel for a safety and document inspection may not be based upon mere whim but requires an articulable belief that such action is warranted.
The observations that the Scott Bader was moving under power and sail at night (7:25 p.m. on Oct. 2, 1978) without green starboard or masthead lights and with an extremely dim stern light justified further inquiry. The fact that the vessel was "riding heavy” in the water constituted another signal that attention was warranted. In stopping and boarding the vessel, the Coast Guard was not arbitrarily intruding upon the privacy of the occupants of the vessel but was acting properly and within the scope of its duties.
The subsequently discovered odor typical of marihuana and the observations of the contraband in "plain view” would justify a seizure and arrest.
In United States v One (1) 43 Foot Sailing Vessel (supra), the Coast Guard had boarded the vessel to check for safety and fishery violations under sections 2 and 89 of title 14 of the United States Code as the vessel was proceeding at night without lights. During the course of the safety inspection, a *1008 large bag containing a grassy substance in plain view was seen in the galley. Moreover, there was an overpowering smell of marihuana. The District Court found that the lack of lights at night was sufficient cause and authority to board the vessel for a safety inspection and that the marihuana was in plain view and that the officer thus had a right to seize it. In dictum, the District Court also stated that the smell of the marihuana would have justified further examination of the bags on board the vessel. In affirming the District Court in a Per Curiam opinion, the Fifth Circuit stated that "we specifically hold that 14 U. S. C. A. § 89(a) is constitutional.” (United States v One (1) 43 Foot Sailing Vessel, 538 F2d 694, supra.)
United States v Odneal (supra) is yet another case dealing with the discovery of marihuana aboard a vessel. In that case, the Coast Guard decided to stop the vessel for two reasons, the yacht’s failure to acknowledge the Coast Guard’s presence and their observing that the vessel was riding low in the water, was being powered by both sail and motor and yet traveling at a speed of only eight knots, that the crew appeared "raggletaggle” and that the yacht was poorly rigged. This led to a suspicion that the yacht was stolen. Second, that the poor rigging, plus dragging halyard lines indicates a hazardous condition. In the process of making this stop, the smell of marihuana was detected as coming from the vessel and this substance was discovered subsequent to the boarding. The court determined that the stop and search were not a violation of the defendant’s Fourth Amendment rights.
In United States v Hillstrom (533 F2d 209, cert den 429 US 1038), marihuana was seized by the Coast Guard while on board the vessel to make a safety and documentation inspection. Again the court held that the inspection was permitted in accordance with the statutory authority of title 14 (§ 89, subd [a]) of the United States Code. In the course of ascertaining the numbers of the boat’s frame, it became necessary to dislodge cargo which obstructed their view. This cargo turned out to be the marihuana. In refusing to suppress this evidence, the court found that the marihuana was in "plain view” and that its seizure under that doctrine was valid since the law enforcement officer came across the incriminating evidence only after he had been justified in making the initial intrusion pursuant to his statutory authority.
A conclusion that the Coast Guard was authorized to stop and detain the vessel for the purpose of calling the crew’s *1009 attention to safety hazards and for the purpose of checking the registration of the vessel would ordinarily make it unnecessary to reach the question as to whether the Coast Guard also had justification for a stop based upon a suspicion that the vessel was engaged in illegal activity.
The defendants claim, however, that the safety stop was merely a pretext to board the vessel and search for contraband and in support call attention to the fact that there was a 25-minute lapse between the order to stop and the boarding while the Coast Guard allegedly checked with the Drug Enforcement Agency to learn whether the Scott Bader was a so-called "hot list”.
If the court were to find the fact pattern and inferences apparently urged by the defendants, the search could nevertheless be a reasonable and proper exercise of the function of the Coast Guard under a customs-border search rationale.
The Coast Guard is empowered to "enforce or assist in the enforcement of all applicable Federal laws on and under the high seas and waters subject to the jurisdiction of the United States”. (US Code, tit 14, § 2; emphasis supplied.) It is also authorized to serve as a customs agent (US Code, tit 19, § 1401, subd [i]; United States v Thompson, 475 F2d 1359, 1362).
The authority for the customs search of a vessel within "customs waters” is set forth in title 19 (§ 1581, subd [a]) of the United States Code which provides: "Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters * * * and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle”.
Notwithstanding the unequivocal language of this section, the Fourth Amendment imposes a standard of reasonableness upon all such searches and seizures. (United States v Freeman, 579 F2d 942, supra.) What is reasonable depends upon the circumstances of the case.
In United States v McGlone (394 F2d 75), the court points out that while there is no rigid formula for the testing of reasonableness, a search incidental to the crossing of a border usually presents no problem. A border search is recognized as an exception to standards requiring probable cause and is regarded as reasonable because it is grounded in the recognized right of the sovereign to control who and what may *1010 enter the country. Nor is there any distinction in constitutional doctrine stemming from the mode of transportation across our border. (United States v Ramsey, 431 US 606.)
Recognizing that the search of the Scott Bader may be viewed as a customs search at the functional border, we now turn to what, in the absence of a requirement of probable cause or a warrant, constitutes a basis for a constitutionally permissible search, to wit, what is "reasonable” within Fourth Amendment proscriptions.
In the border search context, the concept of "reasonable” has been found to automatically exist by simple reason of entry into the United States from a point without our borders. (United States v Ramsey, supra; Almeida-Sanchez v United States, 413 US 266, supra; Carroll v United States, 267 US 132.)
As stated in Ramsey (pp 616, 619):
"That searches made at the border pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration. * * *
"Border searches, then, from before the adoption of the Fourth Amendment, have been considered 'reasonable’ by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable’ has a history as old as the Fourth Amendment itself. We reaffirm it now.”
Accordingly, this court finds that a customs search of a person or vessel who has made a foreign entry need not be based upon "reasonable or articulable suspicion that criminal activity is involved”. (United States v Chaplinski, 579 F2d 373; United States v Ramsey, supra.)
But two requirements are necessary: (1) the search must be at a border or its functional equivalent; and (2) there must be some suspicion that the border was crossed.
One example of a functional border would be "a search of the passengers and cargo of an airplane arriving at St. Louis *1011 airport after a nonstop flight from Mexico City” (AlmeidaSanchez v United States, supra, p 273). A second and more pertinent example is the stop of a vessel which has crossed from international waters into customs waters (which extend four leagues [approximately 12 nautical miles] from the coastline) (US Code, tit 19, § 1401, subd [j]; United States v Tilton, 534 F2d 1363, 1365). As stated in Tilton (p 1365): "Just as it is not practical to set up fixed checkpoints at the boundaries of United States airspace and require all incoming aircraft to stop and be subject to customs searches, see Almeida-Sanchez, supra, 413 U.S. at 273, 93 S.Ct. at 2539, 37 L.Ed.2d at 603, for obvious reasons, it is not practical to set up checkpoints at the outer perimeters of the territorial waters. Nor is it likely that incoming vessels will pick up or discharge passengers or cargo between their points of entry into territorial waters and their anchorages at United States ports. * * * For the same reasons that a search by Border Patrol officers is valid at a functional equivalent of a border, we hold that a customs search pursuant to section 1581(a) of such a vessel at such a place can be valid under the Fourth Amendment as a border search.”
In the case at bar, the Scott Bader was observed moving in a westerly direction between the north and south forks of Long Island in waters designated as Gardiners Bay and so positioned as to justify an opinion by the Coast Guard personnel that it had entered the area from the ocean.
In United States v Solmes (527 F2d 1370, 1372) the court stated: "Certainly a bay adjacent to an ocean is logically no different from an airport. Thus we hold that based on the facts of this case, [the defendants] were at the functional equivalent of the border at Mission Bay [San Diego] when the search took place.”
The second requirement is that the vessel has entered from foreign waters. There is no evidence that the Scott Bader was earlier observed in foreign waters or seen crossing any international boundary. But observation is not the test (United States v Ingham, 502 F2d 1287, cert den 421 US 911). Rather it is one of reasonable belief that the vessel has crossed the border (United States v Ivey, 546 F2d 139, supra; United States v Tilton, supra; United States v Fogelman, 586 F2d 337). "The law — indeed criminal law — allows for common sense. And common sense allows persons in their affairs to draw inferences from circumstances.” (United States v Ingham, supra, pp 1290-1291.)
*1012 Moreover, this finding of a border crossing has been upheld on an "after the fact theory”. Thus, a customs search has been upheld where information, given to customs officials, that the boat had come from Cuba was received after the Coast Guard had been told by the crew during an earlier safety inspection that the vessel had sailed only in domestic waters. (United States v Wing, 450 F2d 806, cert den 405 US 994.)
In the case at bar, the direction of movement and the registry of the vessel supplied a reasonable basis for the belief that the Scott Bader had come from foreign waters. In his appearance before the Grand Jury, the defendant, Nissen, testified that the point of origin was, in fact, Colombia.
The passage of the Scott Bader across a functional border into the jurisdictional waters of the United States created a reasonable basis for a customs search by the Coast Guard. No pretext was necessary to develop this right of inspection of the cargo under title 19 (§ 1581, subd [a]) of the United States Code.
Defendants have also moved for other items of pretrial relief which are determined as follows.
(1) I have inspected the Grand Jury roll and find that at least 22 grand jurors were present on each day of the presentment and that they voted upon the indictment.
(2) I have examined the Grand Jury minutes and find them legally sufficient to support the charges as contained in Indictment No. 2392-78 as against each of the defendants. Additionally, the minutes disclose that the defense of force majeure was properly charged to the Grand Jury in a manner which gave them an adequate statement of the applicable law and the opportunity to determine whether this defense would preclude indictment of the defendants for the crime charged. (United States v Park, 421 US 658.)
I further find that the allegedly impermissible questions put to defendant Nissen were not a prejudicial comment upon his Fifth Amendment right to remain silent. (United States v White, 444 F2d 1274, cert den 404 US 949; United States v Warren, 550 F2d 219, cert den 431 US 940.) In any case, given the other overwhelming evidence presented to the Grand Jury, these questions, even if impermissible, are, at best, harmless error. (Chapman v California, 386 US 18.)
(3) Defendants further contend that section 221.30 of the Penal Law unconstitutionally violates Eighth Amendment *1013 prohibitions against cruel and unusual punishment. The presumption of constitutionality is one of the strongest and "not readily overcome”. (People v Venable, 46 AD2d 73, 75, affd 37 NY2d 100; People v Pagnotta, 25 NY2d 333.) Under the "Rockefeller” drug laws, marihuana was embraced within the schedules of controlled substances and possession of more than one ounce was classified as a class C felony. The 1977 amendments to this law removed marihuana from the schedule of drugs covered by article 220, organized the offense under 221 and, in fact, drastically reduced the penalties for possession of small quantities. Only when possession reaches more than 10 pounds is the crime now considered a class C felony. As the Legislature has determined that a maximum prison term of 15 years for large-scale possession "would serve more effectively than some less severe punishment” (see People v Broadie, 45 AD2d 649, 654, affd 37 NY2d 100), it is the Legislature and not the courts which must make any ameliorative change in the penalty (People v Broadie, supra; People v Venable, supra; People v Morehouse, 80 Misc 2d 406).
As the presumption of validity which attaches to all legislation remains unrebutted, I hold section 221.30 of the Penal Law to be constitutional and not in violation of the principles of the Eighth Amendment.
(4) The indictment meets the requirements of CPL 200.50 (subd 7) as it contains a plain and concise factual statement with sufficient precision to apprise the defendants of the conduct which is the subject of the accusation. (People v Iannone, 45 NY2d 589.)
CONCLUSIONS
(A) The defense of safe harbor is available to the defendants and may constitute a jurisdictional bar to prosecution. The issues of fact involved shall be determined by the trial jury.
(B) Title 14 (§ 89, subd [a]) of the United States Code which permits the Coast Guard to make safety and document checks of vessels without a warrant is held to be constitutional but there must be some articulable basis for that inspection.
(C) Evidence of the presence of marihuana obtained upon due and proper boarding of the vessel found to be in "plain view” or because of a pervasive and distinctive odor is admissible.
(D) That at a border or functional border a vessel may be made the subject of a warrantless customs search if the vessel *1014 was crossing that border and came from foreign territory (US Code, tit 19, § 1581, subd [a]) and the Coast Guard may act as customs officers.
(E) Section 221.30 of the Penal Law relating to possession of marihuana is constitutional.
(F) The motion to dismiss the indictment for the reasons referred to above is denied.
(G) This opinion also determines the legal principles involved on the motion to suppress. A hearing will be held on February 14, 1979 at 9:30 a.m. with respect to any residual factual issue which may be raised by the defendants.