THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALAN VAN HORN and PAUL NISSEN, Appellants.

Second Department, July 28, 1980

APPEARANCES OF COUNSEL

*Gerald B. Lefcourt* and *Charles L. Weintraub (Richard Ware Levitt* of counsel), for appellants.

*Patrick Henry, District Attorney (Vincent A. Malito* of counsel), for respondent.

## OPINION OF THE COURT

TITONE, J. P.

In a one-count indictment appellants were accused of crimi-

nal possession of marihuana in the first degree (Penal Law, § 221.30) resulting from the discovery of 14,000 pounds of marihuana by Coast Guard officials on the sailboat, the *Scott Bader*. The boat was boarded by such officials without a search warrant in Block Island Sound (near the entrance to Gardiner's Bay) at about 7:30 P.M. on October 2, 1978, and the contraband was discovered shortly thereafter.

Appellant Van Horn pleaded guilty to attempted criminal possession of marihuana in the first degree and was sentenced to a prison term of one year, while appellant Nissen pleaded guilty to criminal possession of the same substance in the first degree and was given a prison sentence of zero to three years. Each appeal brings up for review the denial of appellants' motions to suppress physical evidence and oral statements.

The questions presented on appeal are (1) whether, under the circumstances, the seizure of the contraband by the Coast Guard officials stemming from their boarding of the vessel, without a search warrant, was justified on the grounds that the Coast Guard officers were lawfully conducting (a) a customs border search of a vessel whose trip was of foreign origin (see US Code, tit 19, § 1581, subd [a]), and/or (b) a safety check, and (2) whether the statements made by appellants while in custody after the seizure of the contraband were obtained in violation of their Fifth Amendment rights?

I. STOPPING AND BOARDING THE SAILBOAT AND DISCOVERY OF THE MARIHUANA

On the evening of October 2, 1978, the Coast Guard cutter *Point Wells* was being used on routine law enforcement patrol. Included in its crew were the ship's executive officer, Petty Officer Paul W. Keller, second in command, and his superior, Master Chief Bosun Mate Manford Durkee, the officer in charge.

Keller testified that he first "observed" the sailboat, *Scott Bader*, on radar, and shortly thereafter, at about 7:25 P.M., he observed the ship's port (left) running light, which is red.[1] After receiving permission from Durkee to obtain a closer look, he proceeded to draw the cutter up to the right rear of the sailboat. By means of a light he shone on the stern, Keller

---

1. Paragraph B of rule 21 of the Navigational Rules (*Coast Guard Pub Book 169* [May 1, 1977]): "Side lights—mean a green light on starboard side and a red light on the port side each showing an unbroken light over an arch of the horizon of 112.5 degrees and so fixed as to show the light from right ahead to 22.5 degrees abaft the beam on its respective side."

saw the name of the sailboat and that its home port was Georgetown, Grand Cayman Islands. As he swung the cutter around he also noted that there was no masthead light on the sailboat and its stern light was very dim.[2] After still more maneuvering of the Coast Guard vessel, he saw that the starboard running light of the sailboat was unlit. (Chief Durkee testified that he also observed from the bridge that the sailboat had no starboard light.) The lights in question convey a vessel's position and movement to other vessels in the area, and are required by Coast Guard regulations.

Keller testified that because of the navigation light violation, he prepared a party for boarding and suggested such action to Durkee for that reason. In accordance with Coast Guard practice, since a boarding was imminent an "EPIC" (El Paso Information Center) check was obtained with respect to the *Scott Bader.* The check revealed that the sailboat had been on the "Suspect Vessel Lookout List" until June, or July, 1976.[3]

The sailboat, which was moving west, was stopped by the crew of the cutter at the northern tip of Gardiner's Island, which is west of Montauk Point and Orient Point, and within the territorial waters of Suffolk County. Keller advised defendant Paul Nissen that a Coast Guard party was coming aboard "to see that he would comply with Federal laws and regulations." When asked by Nissen whether he meant a safety check, Keller repeated his statement about seeing to it that Nissen would comply with Federal laws and regulations.

Once on board the sailboat Keller asked Nissen for the skipper, how many people were on board and whether there were any weapons on the vessel. Nissen identified himself as the skipper and said that there were no weapons on board and that defendant Alan Van Horn was the only other person on the ship. After Keller asked to see the vessel registration and personal documentation, both he and Nissen proceeded to go down to the cabin. While standing at the opening to the cabin entrance Keller, who had had training in narcotics, detected a

---

2. Rule 21C of the Navigational Rules (Coast Guard Pub Book 169 [May 1, 1977]) provides that a stern light shall be an unbroken arc of 12 points (135 degrees); rule 22 provides that the visibility of such light shall be a distance of two miles; and rule 20B further provides that all lights be on from sunset to sunrise while a vessel is underway.

3. According to Durkee word was received from the "EPIC" check that the *Scott Bader* had been on the list until two years previously, as a suspected smuggling vessel.

very strong odor of marihuana. Keller then descended the ladder to go below deck where Nissen was standing. When he reached the bottom Keller looked around and saw 12 to 15 burlap bales. After advising Nissen not to make any statements, Keller read him his *Miranda* rights and announced that he was going to open one of the bales. Upon opening one of them and noting that the contents resembled marihuana, Keller advised Nissen that he was under arrest and that the vessel and cargo were being seized by the United States Coast Guard. When he went back on deck, Keller made similar statements to Van Horn and also read him his *Miranda* rights. More than 300 bales containing approximately 14,000 pounds of marihuana were ultimately discovered on the sailboat.

Testimony was also taken at the suppression hearing from Manford Durkee, the Master Chief Bosun Mate and officer in charge of the Coast Guard Cutter *Point Wells.* Durkee testified that he first decided to board the sailboat because of the information he received that at one time it had been on the "Alert List" and also that it was riding low or deep in the water which indicated, *inter alia,* that it was carrying a heavy cargo. Durkee's testimony as to when a decision was made to board the sailboat and the basis for it is contradictory and confusing. On one occasion he testified that he did not make the decision to go aboard because of his observation that the sailboat was riding deep in the water, but rather that the decision was made when Keller saw the vessel. Keller had informed him earlier about the defective condition of some of the lights on the sailboat, and Durkee himself saw there was no starboard light when they came alongside the *Scott Bader.* However, later in his testimony Durkee explained that the additional information about the sailboat formerly being on the "Alert List" helped make the decision to board. Still later, on cross-examination, Durkee testified that while "they" had decided to board the sailboat before the "Alert List" (also called the "Lookout List") report, the report was "the clincher." It was also brought out on redirect examination of Durkee that the "situation report" he prepared after he returned to Montauk indicated that the sailboat's riding low in the water and the "EPIC" report were the basis for boarding. No mention was made in such report about any of the lights on the vessel being faulty. Durkee also testified that as a result of law enforcement being stepped up in his geographic

area he followed the policy of selecting boats at random and boarding them even though there may be no indication that anything was wrong.

## A. CUSTOMS BORDER (FUNCTIONAL BORDER) SEARCH

■ After the conclusion of the suppression hearing, Criminal Term held (97 Misc 2d 1000) that the Coast Guard officers, acting as customs officers, conducted a valid border or functional border search without a warrant, of a vessel coming from a foreign territory (see US Code, tit 19, § 1581, subd [a]). It has been held that a customs search of a person who, or vessel which, has made a foreign entry need not be based upon reasonable or articulable suspicion that criminal activity is involved *(United States v Ramsey,* 431 US 606; *United States v Chaplinski,* 579 F2d 373). Searches made at a border are reasonable simply by virtue of the fact that the person or item has entered our country from outside. The long-standing recognition that searches at our borders without probable cause, and without a warrant, are nonetheless reasonable has a history as old as the Fourth Amendment itself. Indeed, such doctrine predates the Fourth Amendment (see *United States v Ramsey, supra).*

The "functional equivalent" of a border may be described as a particular place which, because of its physical characteristics and the nature of the traffic flowing through it, is considered as a reasonable extension of the border for the purpose of making a warrantless customs search, although its location may be some distance from the border itself *(United States v Johnson,* 588 F2d 147). In addition, a particular search may be the functional equivalent of a search at the border if the object of the search has been kept under constant surveillance from the border to the point of search *(United States v Johnson, supra).*

Examples of a functional border or the functional equivalent of a border are domestic airports used for nonstop flights from foreign countries, and ports of entry in this country for ships traveling from foreign ports *(Almeida-Sanchez v United States,* 413 US 266, 273).

However, before a search of a person or vessel may be deemed to be a customs search, two requisites have to be met, namely, (1) the search must be at a border or its equivalent, and (2) there must be some suspicion or reason to believe that the border was crossed (cf. *United States v Fogelman,* 586 F2d 337, 343).

In the instant case, Criminal Term noted that the *Scott Bader* was moving in a westerly direction between the north and south forks of Long Island in waters designated as Gardiner's Bay. Thus, since it was so positioned as to justify an opinion by Coast Guard personnel that it had entered the area from the ocean, Criminal Term concluded (97 Misc 2d 1000, 1011, *supra)* that the vessel, at the time, was at the "functional equivalent" of the border, citing *United States v Solmes* (527 F2d 1370).

With respect to the second requirement, i.e., a suspicion by the customs officials (in this case the Coast Guard officers purportedly acting as customs officials) that the *Scott Bader* had crossed the border, Criminal Term did not specifically so hold. However, it intimated that the officers from the Coast Guard, based on the circumstances, had drawn an inference that the sailboat had previously crossed the border. I disagree with such conclusion.

The transcript of the suppression hearing is totally bereft of evidence that the Coast Guard personnel on the cutter *Point Wells* had any idea or suspicion, or even surmised, before or at the time they boarded the *Scott Bader,* that its voyage originated from a foreign port. As mentioned above, testimony elicited from Coast Guard Officers Keller and Durkee indicated that the purported reason or reasons for boarding the sailboat were for a safety and documentation check stemming from the malfunctioning of the vessel's exterior lighting, the fact that the vessel was lying low in the water, which indicated that it was carrying a heavy cargo, an "EPIC" check which revealed at one time it had been on the "Alert" or "Suspect Lookout" list, and at the time the Coast Guard had a policy of boarding and searching ships at random without a search warrant and without probable cause. To constitute a bona fide border search at a functional equivalent, it is essential that there be a reasonable belief by the searching authorities that a border crossing has occurred (cf. *United States v Tilton,* 534 F2d 1363, 1366). In *Almeida-Sanchez v United States* (413 US 266, *supra),* a roving border patrol stopped the petitioner's automobile 25 miles from the Mexican border. In the ensuing search of the vehicle without a warrant, marihuana imported from Mexico was discovered. In rejecting the contention of the Federal prosecutor that the search could be sustained without probable cause to believe that the car had

made a border crossing, the United States Supreme Court stated (pp 272-275):

"Whatever the permissible scope of intrusiveness of a routine border search might be, searches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well. For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

"But the search of the petitioner's automobile by a roving patrol, on a California road that lies at all points at least 20 miles north of the Mexican border, was of a wholly different sort. In the absence of probable cause or consent, that search violated the petitioner's Fourth Amendment right to be free of 'unreasonable searches and seizures.' * * *

" 'Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. *But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.'* " (Emphasis supplied.)

I also disagree with Criminal Term's finding of a border crossing on an "after the fact" theory, i.e., the validation of the intrusion as a customs search upon a subsequent discovery that the vessel had come from international waters. A search may not be justified by its proceeds alone. Constitutionally protected rights are not to be dispensed with solely because the improper search and seizure uncovered illegal activity or contraband (cf. *People v Sobotker,* 43 NY2d 559). Any idea that a search can be justified by what it turns up was long ago rejected in our constitutional jurisprudence. A search conducted in violation of the Constitution is not made lawful by what it brings to light *(Bumper v North Carolina,* 391 US 543).

To validate the subject search based on facts upon which

the boarding officers did not rely because they were outside their knowledge at the time, would be illogical and would do violence to rights guaranteed under the Fourth Amendment. Traditional border search concepts do not justify a search of a boat first sighted within the coastline on the grounds it came from international waters, when initially the searching officers had no basis for believing such to be the fact *(United States v Whitmire,* 595 F2d 1303).

*United States v Wing* (450 F2d 806, cert den 405 US 994), upon which Criminal Term based its "after the fact" theory (97 Misc 2d 1000, 1012, *supra),* is not a clear authority for the court's position. In a somewhat confusing narrative, the Ninth Circuit based its finding of a valid border search upon the rationale that (p 810): "It was only after the discovery of the marijuana in San Francisco that the vessel was searched. The boarding agents had word from San Francisco * * * that the vessel had arrived from Guantanamo, Cuba * * * This was their first knowledge of that fact. *Cf. Alexander v. United States,* 362 F.2d 379 (9th Cir. 1966)."

Such language in *Wing (supra),* although vague, seems to suggest that the marihuana was discovered before the so-called border search, and that the search was conducted after the officers learned that the ship had originated in Cuba. Thus, *Wing (supra)* does not support Criminal Term's rationale that the search in the present case is sustainable on an "after the fact" theory.

## B. SAFETY CHECK

Under section 2 of title 14 of the United States Code, the Coast Guard has broad authority to enforce Federal laws upon the high seas and waters subject to the jurisdiction of the United States and to enforce regulations for the promotion of safety of life and property within that jurisdiction. It also has authority under the same title (§ 89, subd [a]), to board vessels and make "searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States.

However, broad statutory grants of enforcement powers are subject to the strictures of the Fourth Amendment, because "no Act of Congress can authorize a violation of the Constitution" *(Almeida-Sanchez v United States,* 413 US 266, 272, *supra; United States v Odneal,* 565 F2d 598, 601). Thus, the Ninth Circuit in *United States v Piner* (608 F2d 358) disal-

lowed a routine document and safety inspection of a boat in San Francisco Bay without a warrant and without probable cause or founded suspicion to believe that a violation of law had occurred. The Coast Guard stipulated that the only purpose for boarding was a routine safety inspection decided upon at random. As a result the two tons of marihuana discovered during the ensuing inspection were suppressed.[4] Consistent with the reasoning in *Piner (supra)* is the position taken by the United States Supreme Court in *Delaware v Prouse* (440 US 648). In *Prouse* our highest court held that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping the vehicle and detaining the operator in order to check his driver's license and the registration of the vehicle are unreasonable under the Fourth Amendment.

However, in this instance the record clearly demonstrates that the Coast Guard officials on duty on the *Point Wells* had an articulable reason and sufficient basis not only to stop the sailboat and make inquiry, but also to board the vessel and conduct a safety check. In *United States v Odneal (supra)* the Ninth Circuit held that Coast Guard officers were authorized under section 2 of title 14 of the United States Code to stop, detain and board a sailboat traveling off one of the Channel Islands about 16 miles from the coastline of southern California for purposes of calling the crew's attention to safety hazards created by the defective rigging and dragging lines observed by such officers, and to board the vessel in order to inspect the registration papers and conduct a safety inspection. The court in *Odneal (supra)* also impliedly held that the customs officer who was also aboard the Coast Guard cutter to assist in the law enforcement duties, observed that the yacht was riding low in the water and hence was also justified in participating in the brief detention. Furthermore, since the customs officer also detected the odor of marihuana before actually boarding the yacht, such fact supplied probable cause for the ensuing search and seizure of the marihuana.

---

4. The Fifth Circuit seems to have taken an opposite position in a similar case. In *United States v Whitmire* (595 F2d 1303, 1315), that court stated, *inter alia:* "We have already judged it reasonable under the fourth amendment for customs officials to stop any vessel found in customs waters and board it for a document check" (citing *United States v Freeman,* 579 F2d 942).

In the instant case, both Keller and Durkee, at the hearing, expressed an articulable reason for boarding the sailboat, i.e., Keller for a safety check based on his observations of defective exterior navigation lighting on the subject vessel, and Durkee because the vessel was lying low or heavy in the water, together with the fact that at one time in the not too distant past it had been on the "Suspect Vessel Lookout List". Probable cause was not present at the time of boarding to justify a search of the sailboat for contraband (cf. *United States v Whitmire,* 595 F2d 1303, 1308, *supra).* However, probable cause undoubtedly accrued when Keller smelled the marihuana shortly after the boarding (cf. *United States v Whitmire, supra,* p 1308).

In their brief on appeal appellants place great stress on the fact that Keller and Durkee each had an independent justification for stopping the sailboat and boarding it. First of all it should be noted that at one time in his testimony Durkee stated that he was aware of Keller's reports about the defects in the *Scott Bader's* navigational lighting and that vessels are boarded or at least stopped whenever possible safety violations are observed. The fact that Durkee also testified at the hearing that he followed a Coast Guard policy of random searching without probable cause does not vitiate a finding that there was probable cause present for the stopping of the *Scott Bader* for a safety check. Nowhere in the record is there a scintilla of evidence to rebut a conclusion that at the time the exterior lighting upon the sailboat was defective to some degree. In any event, the fact that Keller and Durkee co-operated with one another does not impair the justification for the stop, the boarding and the ensuing discovery of the contraband (see *United States v Odneal,* 565 F2d 598, 602, *supra).*

Finally, on this issue, belying the assertion of appellants that the sole purpose of the Coast Guard officials in boarding and seizing the sailboat was either to make a random search or to search for contraband, is the fact that such officials brought with them at the time of boarding, a boarding kit which included official forms to check off possible safety violations, *but did not take along their marihuana inspection kit.*

## II. STATEMENTS OF APPELLANTS WHILE IN CUSTODY

After the marihuana was discovered on the *Scott Bader* and appellants were read their *Miranda* rights by Keller, the vessel proceeded to Montauk. No statements were made dur-

ing the voyage to that port. When the vessel docked at Montauk, the occupants were met by two Customs Department officers and Joseph Russo, a detective from the Suffolk County Police Department. Appellants were then escorted by the Customs Department officers into the Coast Guard center and each was placed in a separate office.

One of the customs officers, Colin Hendry, testified that at approximately 10:30 or 11 P.M. he first read appellant Van Horn his *Miranda* rights, and then did the same with appellant Nissen. At the conclusion of each reading he asked each appellant whether he understood what was read to him. After Van Horn answered in the affirmative, Hendry asked him if he wanted to waive his rights. According to Hendry the latter said that although he waived his rights, he did not believe he knew anything that would help the police. Nissen also said he would waive his rights. Aside from asking appellants questions about pedigree, i.e., name, occupation, etc., neither customs officer conducted any further interrogation.

However, shortly thereafter, Detective Russo took over the interrogation of appellants. He testified that after hearing Hendry read appellants their *Miranda* rights, he (Russo) asked Van Horn if he wished to co-operate. Van Horn responded that he did not think he knew anything that would help the authorities. However, he did acknowledge knowing Nissen from some time he spent in the Cayman Islands, and that while in Washington he was recruited by Nissen to go with the latter to Colombia and help with the marihuana smuggling operation. For such help Nissen paid him $25,000. However, Van Horn told him that he did not know where delivery was to be made.

Russo then testified that after obtaining such information from Van Horn, he proceeded to the room in which Nissen was being held, and informed the latter what Van Horn had revealed to him. Nissen acknowledged that he had been in Colombia and that he and Van Horn had been on the water for two months. At one point Nissen agreed to show Russo on a chart where delivery was to be made. However, when they went to the chart table for that purpose Nissen refused to do so.

Convinced that Nissen would not divulge any more important information, Russo then suggested that he might consider being a witness for the State against the people who hired him. Nissen, according to Russo, responded that he could not

make that decision without consulting an attorney and that somewhere on board the sailboat he had the name of an attorney given him by the people who hired him, so that "[i]f he ran into trouble, he was to call this attorney". Russo stated he then perused the papers taken from the *Scott Bader* but was unable to find the name of the attorney in question. He suggested to Nissen that in any event if Nissen should decide to become a witness for the State, he might prefer obtaining an attorney who was not involved with Nissen's employer.

Russo also asserted that he was positive that Nissen asked for an attorney only at the very end of the questioning. He particularly remembered this to be the fact because the request by Nissen for the attorney occurred when Russo suggested that Nissen become a witness for the State, and, according to Russo, he only made such suggestion because Nissen "had not told me the things that I wanted to hear. The delivery, who he was going to deliver it to and where, who hired him to do it. That is why I asked him to make a deal with me at that point. I realized that he wasn't going to cooperate unless I offered him something. And then, when I offered him the deal, is the time he said he didn't want to make a deal until he spoke to his attorney."

▮ After the hearing Criminal Term held that the People had established "beyond a reasonable doubt" that both of the appellants made oral statements only after receiving, acknowledging and waiving their *Miranda* rights and that prior thereto no request was made to confer with an attorney or to have access to an address book with an attorney's name in it. *(People v Nissen,* Supreme Ct, Suffolk County, April 11, 1979, JASPAN, J.) On appeal appellants contend that the testimony of Russo as to their statements "and the timing of their request for counsel was *per se* unbelievable" and "simply too incredible". I disagree with their conclusion.

While conceivably appellants' behavior when they were being interrogated at the Coast Guard center may be deemed to have been illogical to some degree, particularly that of Nissen, the absence of logic with respect to their conduct at the time does not render Russo's testimony incredible, unbelievable or impossible of belief as a matter of law. Indeed, appellants' conduct while in custody at the Coast Guard center might be considered to be no more illogical or incomprehensible than their decision to navigate the *Scott Bader* with its obvious defective lighting into the territorial waters of

Suffolk County at 7:30 P.M. on an October evening, a time when boat traffic in the area would most likely be minimal. Under such circumstances it was almost inevitable that the vessel would draw the attention of any law enforcement officials on the scene.

In sum I do not share appellants' contention that the testimony as to the circumstances surrounding the statements made by them while in custody, was "patently tailored to nullify constitutional objections" within the purview of *People v Garafolo* (44 AD2d 86, 88).

I also disagree with Nissen's argument that Russo violated his right to "cut off questioning", citing *Michigan v Mosley* (423 US 96, 103-104). The Supreme Court in *Mosley (supra,* p 103) used the term "a person's 'right to cut off questioning' ", when referring to the critical safeguard set forth in *Miranda* as to the cessation of questioning once an individual exercises his right to remain silent *(Miranda v Arizona,* 384 US 436, 473-476). In this case, Nissen maintains that although he refrained from answering questions about the destination of the *Scott Bader* or where the contraband was to be unloaded, Russo persisted in asking such questions. However, what the record demonstrates is that (1) by waiving his right to be silent, Nissen in effect agreed to discuss the matter with his captors, (2) when he decided to refrain from answering any further questions or volunteering information as to where delivery was to be made he ceased to do so, and (3) he was not pressed to answer any questions he did not wish to answer. In fact, Nissen never did reveal what Russo wanted to know with respect to Nissen's confederates and the "port of delivery" of the marihuana. Thus the record in no way substantiates Nissen's assertion that his right to "cut off" questioning was violated in this instance.

Accordingly, the judgments of conviction should be affirmed in all respects.

COHALAN, MARTUSCELLO and O'CONNOR, JJ., concur.

Two judgments of the Supreme Court, Suffolk County, rendered May 22, 1979 as to defendant Van Horn and June 27, 1979 as to defendant Nissen, affirmed.

The case is remitted to the Supreme Court, Suffolk County, for further proceedings pursuant to CPL 460.50 (subd 5).