The People of the State of New York, Respondent, v Esther Materon, Appellant.

Second Department, March 25, 1985

**APPEARANCES OF COUNSEL**

*Alexander A. Alarid* and *Sidney H. Zuckerman* (*Morgan Kennedy* on the brief), for appellant.

*John J. Santucci, District Attorney* (*Andrew Zwerling* of counsel), for respondent.

**OPINION OF THE COURT**

Lazer, J.

The primary issue is the constitutional propriety of defendant's detention and search in the customs area at Kennedy

Airport after her arrival on an international flight. Also contested is New York's right to prosecute the defendant following her arrest by Federal authorities before she had cleared customs. We conclude the judgment of conviction should stand.

## I

On February 14, 1981, at approximately 6:00 P.M., defendant disembarked at John F. Kennedy Airport from a direct flight that had its origin in Colombia. Having retrieved her suitcase, she proceeded to the customs inspection station where she was observed by a customs patrol officer assigned to scrutinize and evaluate passengers arriving on that flight. Defendant's nervous behavior attracted this officer's attention as she watched defendant change lines at the inspection station several times. After defendant selected a line and ultimately had her luggage inspected at the inspection station, the officer noted that she had an unusual amount of trouble closing her suitcase. Defendant was unable to flex her knees and had to extend one leg out in order to reach down toward her luggage. Wearing tight fitting jeans and high-heeled shoes, she moved so awkwardly with each step that, in the words of the customs officer, she was "unable to move as normal persons move".

The agent approached defendant, exhibited her badge, and requested to see defendant's passport and declaration form. Since defendant's airline ticket was inside her passport, the officer noticed that the ticket had an "open" return date and had been purchased with cash and that defendant had remained in Colombia for about two weeks. The passport also indicated that defendant had made two prior trips to Colombia within a relatively short period of time.

The combination of these factors and her observations of the defendant prompted the officer to request that the customs inspection be continued, and she asked the defendant to accompany her a short distance to a private search area. Defendant complied, and during the pat-down search that followed, the officer felt a bulge in defendant's crotch area. Upon request, defendant removed four condoms which she had hidden inside her pants. The condoms contained a white powder which was immediately field tested and proved positive for cocaine. Defendant was then arrested.

Following the discovery of cocaine, a second female officer was requested to witness a strip search. Defendant removed her clothing, which was inspected for contraband, but none was found. The officers then asked defendant to bend down from the waist, but she refused and was permitted to dress.

An agent from the Federal Drug Enforcement Administration (DEA) read the *Miranda* warnings to defendant and asked if she had any more cocaine hidden on her body. The reply was "No". A short time later, both defendant and the drugs were turned over to Port Authority officers who once again read the *Miranda* warnings to defendant. She was then taken to a private room where a second strip search was performed. Defendant was asked to squat down, and two more condoms, both filled with cocaine, fell from her vagina.

After defendant dressed again, a Port Authority officer inquired as to whether she had hidden still more drugs and warned her that it was dangerous to secrete drugs inside her body. Defendant then declared that she had two more condoms in her anal cavity. She was taken to the medical facility at the airport, where she was given a laxative and excreted the cocaine-filled condoms. In all, the eight condoms recovered from defendant contained an aggregate amount of over 10 ounces of cocaine.

Following her indictment by a Queens County Grand Jury for criminal possession of a controlled substance in the first degree, defendant moved to suppress the physical evidence, claiming that the Government agents lacked any justification for the stop, inquiry and subsequent searches. The hearing court denied the suppression motion, finding that these actions were reasonable and lawful under the circumstances. Having justified the initial inquiry and pat down of defendant as a typical border search, the court determined that the discovery of the cocaine from the pat down elevated the officer's suspicions to probable cause, which in turn justified the secondary searches of defendant, including both the strip search and the body cavity search.

Midway through the trial that followed, defendant withdrew her plea of not guilty and pleaded guilty to criminal possession of a controlled substance in the second degree. During the plea allocution she declared that she had been visiting her sister in Colombia, was approached by a woman shortly before her return trip and asked to bring back medicine, was told by a passenger on the plane that the substance was cocaine and, knowing that it was illegal to bring cocaine into the country, she hid it in her body. Defendant was sentenced to an indeterminate term of five years to life imprisonment.

## II

The initial issue is whether it was proper for a New York court to accept jurisdiction over the instant offense after the Federal authorities declined to prosecute defendant for a violation of the

customs law. The current State prosecution derives from actions undertaken by Federal customs inspectors who performed what is now sought to be justified as a valid border search. While defendant concedes that customs officials have broad investigatory powers under Federal law (*see,* 19 USC § 1582), she contends that the purpose of these powers is to enforce Federal laws against the unlawful importation of contraband and the illegal entry of aliens. Therefore, according to defendant, if any crime was committed it was a Federal crime and New York should not be concerned with an offense that falls squarely within the scope of Federal law.

The fact that defendant's actions constituted a crime under Federal law does not vitiate the equally undeniable fact that those actions also constituted a crime subject to prosecution under New York law (*see, Bartkus v Illinois,* 359 US 121; *Abbate v United States,* 359 US 187; *United States v Jackson,* 470 F2d 684; *People v Sheppard,* 105 Misc 2d 495). Simply stated, defendant unlawfully possessed the cocaine within New York State and is thus subject to prosecution in the courts of this State. Nor is defendant subject exclusively to Federal jurisdiction simply because the crime was committed within the customs area of Kennedy International Airport; defendant has not shown either that New York has expressly ceded that area and jurisdiction over it or that the Federal Government has asserted exclusive jurisdiction by clear and unambiguous legislative action (*People v Zipkin,* 107 AD2d 837; *People v Mitchell,* 90 Misc 2d 463; *see, People v Kobryn,* 294 NY 192; *People v Fisher,* 97 AD2d 651; *cf. Bowen v Johnston,* 306 US 19; *Collins v Yosemite Park Co.,* 304 US 518). Furthermore, the State offense remains intact regardless of the Federal Government's decision not to prosecute the violations of Federal law, and the result is not altered simply because the violations were discovered by Federal rather than State authorities (*People v Zipkin, supra; see, People v Dworkin,* 30 NY2d 706; *People v Mitchell, supra; State v Smith,* 399 So 2d 22 [Fla]; *cf. People v Marcus,* 90 Misc 2d 243).

Equally meritless is defendant's claim that she had not cleared through customs and thus may not be prosecuted because she was not officially within the United States when she was apprehended. Kennedy Airport is within the territorial limits of New York State (*see, e.g., United States v Feld,* 514 F Supp 283) and under Federal law clearing customs is not a prerequisite for finding that contraband has been imported (*United States v Catano,* 553 F2d 497). Once that importation has occurred, the possessor of the contraband is subject to

prosecution under the laws of New York (*see, People v Dworkin, supra*).

The companion argument that at most defendant could be guilty of *attempted* possession, rests on no firmer ground. The fact that defendant had not been formally admitted into the United States when arrested does not limit her crime to that of an attempt. Even under the immigration and nationality laws, where the concept of "formal entry" is truly applicable, a State may prosecute under its statutes those aliens who commit crimes while on American soil but who are not yet officially admitted to the country (Immigration and Nationality Act of 1952 § 288, 8 USC § 1358; *see also,* Gordon and Gordon, Immigration and Nationality Law § 3.14, at 3-48 — 3-49).

### III

While it is thus quite apparent that New York was a proper forum for defendant's trial, the constitutional standards for the review of her 4th Amendment claims are those applicable to border searches. In this respect, it is immaterial that the State rather than the Federal Government chose to prosecute, for the key to any 4th Amendment challenge is the *reasonableness* of the governmental intrusion.

The courts of this State have long recognized the permissible use in New York of evidence seized by customs officials under the relaxed border search standards (*see, People v Dworkin, supra; People v Warren,* 91 AD2d 1007). There is no substance to defendant's contention that she was somehow denied equal protection of the laws because searches of domestic airline passengers are subject to stricter standards.

An airport is the functional equivalent of a border when it receives passengers from an international arrivals flight (*Almeida-Sanchez v United States,* 413 US 266) and border searches are responsive to a very special set of imperatives based on the long-standing right of a sovereign to protect itself. Any person entering the United States after crossing an international boundary may be detained for the purpose of ensuring that both the person and his or her belongings and effects may lawfully enter the country. These inspections, made at the border, are "reasonable simply by virtue of the fact that they occur at the border" (*United States v Ramsey,* 431 US 606, 616; *Almeida-Sanchez v United States, supra,* p 272; *see also, United States v Moody,* 649 F2d 124). The doctrine that renders border searches made without probable cause or a warrant reasonable predates the 4th Amendment itself (*United States v Ramsey, supra; People v Van Horn,* 76 AD2d 378). On more than one

occasion, the Supreme Court has recognized that the same Congress which proposed the Bill of Rights had two months earlier enacted the first customs statute (see, Act of July 31, 1789, ch V, 1 US Stat 29). Commenting on the historical significance of the timing of the enactment, the Supreme Court declared: "'As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as "unreasonable", and they are not embraced within the prohibition of the amendment.'" (United States v Ramsey, supra, p 617, quoting Boyd v United States, 116 US 616, 623.)

As with any governmental intrusion into the privacy of an individual, however, border searches are not immune from 4th Amendment scrutiny and reasonableness continues to be the measure by which such searches are evaluated. Routine searches are made reasonable by the decision to cross the border and "[t]o this extent, the person involved has no expectation of privacy that society is prepared to recognize as reasonable" (United States v Asbury, 586 F2d 973, 975). A routine border search entails the right to stop and detain an individual and to inspect any baggage and personal belongings. No reason is necessary for such a search, other than the fact that the border has been crossed (United States v Ramsey, supra, pp 616-619). The customs inspector need not have any suspicions that the individual being detained might be connected with unlawful activities (United States v Nieves, 609 F2d 642; United States v Himmelwright, 551 F2d 991, cert denied 434 US 902; see also, United States v Martinez-Fuerte, 428 US 543).

That is not to say, however, that all searches can be justified simply because they occurred at a national border. The more intrusive the search sought to be justified, the greater must be the suspicion of criminal activity. Here a pat-down search — a matter of some personal intrusion — was performed on the defendant by a female customs inspector in a private room in the customs area of the airport. The defendant had been singled out by the customs inspector for the pat-down search based on her observations; it was not part of any routine practice of patting down every individual arriving at the airport as a matter of course. A customs inspector who performs a thorough pat-down search as part of his border patrolling activities must have some articulable suspicion to justify the intrusion (see, 19 USC § 482; Shorter v United States, 469 F2d 61) but the amount of suspicion required at that stage is minimal. Indeed, the Ninth Circuit has held that "[m]ere suspicion" will justify a pat-down search (United States v Carter, 563 F2d 1360, 1361). Hence, it is

certainly sufficient if the officer has some reason which she can put into words, which bears a reasonable relation to the possible existence of criminal activity. In this respect, appearance and demeanor alone may provide a sufficient articulable suspicion to justify the further investigation (*see, United States v Rieves,* 584 F2d 740).

Strip searches, which entail an extensive invasion of personal privacy, require a greater justification to be considered reasonable, even in the context of a border crossing. The officer must have a real or reasonable suspicion of illegal concealment before such a search will be considered compatible with 4th Amendment principles (*see, United States v Moody,* 649 F2d 124, *supra; United States v Carter,* 590 F2d 138; *United States v Asbury,* 586 F2d 973, *supra*). This standard requires such suspicion as would cause a customs officer to have a substantial as opposed to mere suspicion that the person is concealing contraband (*Henderson v United States,* 390 F2d 805). For example, although resemblance to a drug smuggler's profile such as that drafted by the Drug Enforcement Agency, standing alone, might not justify a strip search, the combination of the resemblance with other grounds for suspicion such as evasive responses to legitimate questioning does suffice (*see, United States v Rieves, supra; United States v Smith,* 557 F2d 1206, *cert denied* 434 US 1073; *United States v Himmelwright,* 551 F2d 991, *supra*).

Since it is even more intrusive, a body cavity search may not be performed absent "clear indication" of smuggling activities. While this does not require that the suspicion rise to the level of probable cause, there must be definite reason to believe that contraband will be found in the particular area of body which is being searched (*see, United States v Cameron,* 538 F2d 254; *Henderson v United States, supra*).

IV

Urging that she did not merit the special attention of the customs inspector, the defendant argues that there was nothing incriminating discovered in her suitcase; that the police had not received any tip that she might be carrying drugs; that no bulge was visible through her clothing; and that she was not recognized from a previous drug case, as she was not a known trafficker.

There are undoubtedly other "negatives" that defendant could have provided to suggest that there was no reason to single her out from among the persons passing through customs on that day. She did not immediately place a telephone call upon arriving at the airport and she did not use an alias when first

approached by customs officials. Both of these have been recognized as activities signaling the possibility of illegal transportation of narcotics (*United States v Elmore,* 595 F2d 1036; *United States v Ballard,* 573 F2d 913). We decline defendant's invitation to view the lack of these factors as automatically preventing further investigative activity regardless of the presence of other factors, suspicious in nature, which would warrant a contrary result.

■ The customs inspector had much more than what was constitutionally required to justify each successive intrusion to which defendant was subjected. Defendant was traveling by herself, and as such, was a prime candidate for smuggling activities (*see, e.g., United States v Rieves,* 584 F2d 740, *supra; United States v Himmelwright,* 406 F Supp 889, *affd* 551 F2d 991, *supra*). She was returning from Colombia, a "source country" well known for its drug availability and appeal to smugglers (*see, e.g., United States v Aulet,* 618 F2d 182, 189; *United States v Carter,* 590 F2d 138, *supra*). She appeared unusually nervous to the well-trained eye of the customs officer (*United States v Moody,* 649 F2d 124, *supra*) and she was observed frequently changing lines while waiting to have her luggage examined at the inspection area. These factors were coupled with the additional observation that defendant had difficulty bending her knees and was "unable to move as normal persons move". It was only at this point that the customs officer approached defendant to make further inquiry and merely asked her to produce her passport and customs declaration form. From these papers, it was learned that defendant had been in Colombia for only about two weeks, that she had an "open" return ticket, and that she purchased the ticket with cash. The officer also discovered that defendant had made two prior trips to Colombia within a relatively short period of time. These factors provided the officer with additional DEA drug courier profile characteristics which further enhanced the possibility that defendant was transporting narcotics (*see, United States v Rieves, supra; United States v Elmore,* 595 F2d 1036, *supra; People v Warren,* 91 AD2d 1007, *supra*). With this further information made known to her, the officer removed defendant to a private area for the purpose of performing a pat-down search.

The result of the pat down was the detection of four condoms containing cocaine. Once the cocaine had been found secreted on defendant's body, there existed, of course, a real and reasonable suspicion that she was involved in the importation of contraband and that she might have additional cocaine concealed upon her body. Indeed, once the cocaine had been discovered, the

officers had probable cause for defendant's arrest, and the subsequent strip searches and body cavity search were the lawful and necessary extensions of the prior permissible pat-down search (*see, United States v Nieves,* 609 F2d 642, *supra; United States v Asbury,* 586 F2d 973, 976, n 4, *supra; see also, People v Warren, supra*). Hence, defendant's suppression motion was properly denied.

Since we see no basis for modification of the sentence, there should be an affirmance.

MOLLEN, P. J., TITONE and THOMPSON, JJ., concur.

Judgment of the Supreme Court, Queens County, rendered April 21, 1982, affirmed.